**Peggy Lou RIKER and Freda H. Grass-mee, Appellants,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Appellee.**

No. 15072.

United States Court of Appeals
Ninth Circuit.

April 12, 1957.

Rehearing Denied June 17, 1957.

Howard B. Crittenden, Jr., San Francisco, Cal., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Hilbert P. Zarky, George F. Lynch, David O. Walter, John Potts Barnes, Chief Counsel, I. R. S., Washington, D. C., for respondent.

Before DENMAN, Chief Judge, FEE, Circuit Judge, and ROSS, District Judge.

ROSS, District Judge.

This is an appeal from a decision of the United States Tax Court in the consolidated cases of Freda H. Grassmee, and Peggy Lou Riker, under 26 U.S.C.A. § 7482. We will develop the factual background, first as to Freda Grassmee, second as to Peggy Lou Riker, and third as to Christ's Church of the Golden Rule. Mrs. Grassmee will be referred to as Grassmee, Peggy Lou Riker as Riker, and Christ's Church of the Golden Rule simply as the Church.

### Grassmee

Grassmee and her eighty-four year old mother were members of the Church group. She was employed in a law office during the tax years in question, 1948

and 1949, and during that period contributed her entire salary to the Church. She and her mother lived in a housing project maintained by the Church, and the entire subsistence of both mother and daughter was furnished by the Church. In short, Grassmee contributed all her earnings to the Church and the Church in return took care of all of the subsistence needs of herself and mother. The mother, due to her age, contributed nothing to the Church by way of money or services. The contributions made by Grassmee to the Church were accompanied by Church Form 399, which specified that the donations were to be used exclusively for the religious purposes of the Church.

In making her income tax returns Grassmee claimed credit for the 15% deduction permitted by Section 23(o), Title 26 U.S.C.A. (1939 Internal Revenue Act, as amended), on her entire earnings contributed to the Church for religious use, and claimed two personal exemptions, one for herself and one for her mother.

The Commissioner disallowed the deductions claimed under Section 23(o). Grassmee then filed her petition with the United States Tax Court seeking a redetermination of her tax liability. In his answer and amended answer to the petition the Commissioner took the position she was not entitled to the Section 23(o) deduction, and also asserted that she was not entitled to a dependency deduction for her mother. The Tax Court sustained the Commissioner.

█ So far as Grassmee is concerned this Court must determine the following questions:

1. Was the Church, or the Elected Delegates Committee, hereinafter referred to as the Committee, the temporal agency of the Church, such a religious organization as to come within the provisions and meaning of Section 23(o), thus permitting her as the donor of her salary to claim the 15% deduction.

2. Was she entitled to the dependency deduction provided for in Section 25, T. 26 U.S.C. (1939 Revenue Code, as amended).

3. Was the Church such a religious organization as to come under the provisions of Section 101(18), Title 26 U.S.C. (1939 Internal Revenue Act, as amended), allowing her to make her tax return on that basis, namely, by showing her individual portion of the Church income by way of dividend.

### Riker

Peggy Lou Riker and her husband were also members of the Church group, having joined the San Bernardino group in 1947. Prior to joining they operated a drug store in partnership with Mr. Riker's parents. On the termination of the partnership business the Rikers took the store equipment and made a cash settlement with Riker's parents. They then acquired a parcel of real estate and on it with their fixtures, opened up a restaurant under the name of "Your Food Fountain" which was conducted as a Church project. The business was operated by Riker as a project manager and was staffed by a group of Church members known as "Student Ministers." During all of the time the business was operated no salaries were paid to the student ministers nor did Riker draw a salary or retain any of its receipts.

The record indicates that Riker paid the entire gross receipts of the business over to the Committee, and the Committee in turn set up a fund from the general Church treasury from which all of the cost and operating expense of the restaurant was paid. The Rikers and the student minister group were furnished living quarters and subsistence by the Church.

The situation surrounding the ownership and operation of "Your Food Fountain" is somewhat confused by reason of the fact that the Church went into bankruptcy in 1945 and was being so administered during the tax years here in question. Respondent's brief points out that "it is a fundamental assumption of the Tax Court that the restaurant business, Your Food Fountain, was an asset of the bankrupt Church." Like counsel, we take the view that if such was the assumption of the Tax Court then it is er-

ror, for we are of the opinion that the record leads to the opposite conclusion, namely, that the business as well as the physical properties of the business was at all times owned by Riker. That everyone concerned were also in confusion see the agreement with the trustees in Bankruptcy. The Referee in Bankruptcy authorized the trustees to enter into an agreement with Riker for the operation of the restaurant business during the pendency of litigation "to determine the ownership thereof." The agreement was approved by the Referee in his order of May 15, 1947, and reads in part as follows:

"To the end that provisions may be made for the operation of Your Food Fountain * * * so as to preserve the said business and its good will during the pendency of the summary proceedings in the United States District Court relative to the conflicting claims of ownership, the trustees propose the following arrangement: * * *"

Pursuant to this preamble the agreement provided that Riker was to continue to operate the business for her own profit until such time as the ownership thereof was determined, paying all expenses incident thereto, and depositing a certain amount monthly in a trust fund to be maintained by the trustees to be paid over to such of the parties as might finally be determined to be the owner. The agreement became effective April 15, 1947, and was to continue until such time as terminated by the parties or until such time as the Court might determine the matter of ownership, and was to be without prejudice as to the rights of either party on the question of ownership. The record bears out the following recital of Riker's operations.

From May 1947, the restaurant was operated under this management (referring to the plan agreed upon between Riker and the trustees). Of this period from May 1947 until January 1948, the restaurant was run as a "Church project," and the earnings were turned over to the Committee by Riker. From January 1948 until June 1948, Riker ran the business in partnership with persons who were not members of the Church, and from June until September 1948, she operated the business on a percentage basis with a prospective purchaser. Her partnership share of the restaurant's earnings was contributed to the Committee. For five months of her fiscal year 1948, January 20 to June 30, Riker filed partnership returns for three different partnerships that operated the restaurant in this period. In July 1948, the assets of the restaurant were sold to the Committee for $1,500. Riker consented to the sale.

Riker filed an income tax return for her fiscal year 1948 (October 1, 1947, until September 30, 1948), which disclosed a net profit of $7,568.25 from the operation of a restaurant business under the name of "Your Food Fountain." A memorandum attached to the return reads as follows:

"Item 2. Wages, etc. Taxpayer was employed by Own Business for a gross income of $8959.11 during the taxable year. However, under the rules of the apostolic society (of which taxpayer is an associate) that all in the society share their income, $8959.11 was contributed to and became a part of the income for the apostolic society, and is reported as part thereof. Taxpayer would therefore, be taxed twice on the same income by reporting it as wages and also as a dividend. For this reason, this latter sum is reported only as part of the dividend or taxpayer's pro rata share of the net income of said apostolic religious society. (See Item No. 3 Dividends.)

"Item 3. Dividends. 1/575 interest in $217,001.54 net income of the Elected Delegates' Committee of the Ecclesiastical Society of Christ's Church of the Golden Rule, an Apostolic Religious Association, for its accounting period of Oct. 1, 1947 to Oct. 1, 1948. This was not received

as a dividend, but is reported under Sec. 101(18)—Per person in Association $377.39.

"Number of persons in taxpayer's family who were in association and obtained support from Society during Period:

"2 times $377.39 . . . (mother and daughter) . . . $754.78."

In her return for 1948, Peggy Lou claimed the sum of $8,959.11 as a deductible contribution to the Church. This claim was disallowed by the Commissioner and this action was alleged as error in the original petition. In an amended petition, it was prayed that the income of the Fountain be found to be the income of the Church.

The Tax Court sustained the Commissioner's determinations and held (1) that the income derived from the operation of the Fountain by Peggy Lou was her income and not that of the Church organization to which she contributed it; (2) that no part of the amounts contributed to the Church by the taxpayer was deductible as a contribution to a religious organization since the Church was not organized and operated exclusively for religious purposes within the meaning of Section 23(o) of the Internal Revenue Code of 1939; * * *."

In connection with Riker's tax return we are confronted with the following questions:

1. Was the restaurant business known as Your Food Fountain owned and operated by the Church with Riker as project manager, or was it owned and operated by Riker.

2. If the business was owned and operated by Riker, in which event the proceeds therefrom would belong to her and her contribution of the proceeds to the Committee of the Church would constitute a gift, would she be entitled to the Section 23(o) deduction of 15%. It is to be observed that by her amended petition in the Tax Court she abandoned this position and claimed that the income belonged to the Church.

3. If the business was not owned and operated by Riker, was it operated by the Ecclestiastical Church, or by the Elected Delegates Committee, the so-called temporal agency, in which event it would be a "feeder" organization. This calls for the application of Section 101(6).

4. If the business was operated by the Committee, and it should appear that the Committee was not a separate entity from the Church, that is a "feeder" type organization, but an integral part thereof, is the Church such an organization as to permit the application of Section 101(6).

5. Having filed an amended petition wherein she takes the position that since the Committee made its own tax return on Form 1065, partnership form, as an apostolic society, based on the theory that the income from the restaurant operated by her was the income of the Committee, she then asserts that she was only required to show in her return her pro rata share of the entire year's income of the Committee. This invokes the application of Section 101(18).

### The Church

A picture of Christ's Church of the Golden Rule can be gleaned from the following excerpts taken from the briefs. At page 1 of petitioner's reply brief we find this statement:

"Christ's Church of the Golden Rule teaches that Christianity be actually lived and Christianity be applied to everyday life. Those engaged in its ministry apply Christianity to everyday life and the Church spreads its doctrines and teachings by having the public witness these applications to every day life. It uses facilities for this purpose."

On page 17 of petitioner's opening brief a portion of the Tax Court decision is quoted:

"The Church has no church buildings. Its principal reliance is on having its members live in a manner exemplifying Christ's teachings, par-

ticularly by living in a selfless manner. Its student minister training projects, while engaging in commercial activities, were designed to permit the public to witness the application of Christ's teachings to everyday life. Thus the very means chosen by the Church to attain its spiritual purposes involve engaging in commercial activities through its principal temporal agency, the Committee * * *."

In 1948 the Church adopted a constitution which sets forth in Article I a declaration of faith. Article II deals with church organization. Articles III, IV and V deal with the powers of the Senior Elder, Advisory Board of Elders and the College of Pastors. The Senior Elder is the "ecclesiastical head of the Church" with the power "to supervise and veto the acts of any other ecclesiastical officer, agency or committee of the Church." The Advisory Board is elected by the convention and "shall serve only if confirmed by the Senior Elder." It is to be observed that the Board of Elders can only exercise the authority granted them "subject to the written consent of the Senior Elder." The College of Pastors have only "such powers and perform such duties as may be prescribed by the Senior Elder in writing."

Article VI deals with temporal agencies. Parts of this Article are as follows:

"1. The temporal agencies of the Church shall be under and subject to ultimate control by the ecclesiastical authorities of Christ's Church of the Golden Rule.

"2. The temporal agencies of the Church, while subject to ultimate control by the ecclesiastical authorities, shall, insofar as may be practicable, be kept separate from the ecclesiastical agencies of the Church.

"3. The officers, agents and members of the temporal agencies of the Church shall possess such ecclesiastical or other qualifications and be subject to such discipline and supervision as may be prescribed by the

ecclesiastical organization of the Church, or by its canon laws.

"4. The Senior Elder, with the advice of the Advisory Board, shall grant charters to the various congregations, projects and other temporal activities upon such terms, conditions, and reservations as shall be determined by him. Any violation of such terms, conditions or reservations, or of the canon laws of the Church shall, if clearly shown—in accordance with his sole discretion—justify the Senior Elder in the suspension of such charter; or such charter, after hearing, may be declared forfeited by the judgment of an ecclesiastical court of the Church."

At this same time canon laws were adopted. Canon Law No. 3 is directed to secular and temporal administration. It appears that fundamentally there is no separation of ecclesiastical and temporal matters, for it is said "insofar as practical" there shall be maintained a separation of the two phases of the Church. It is obvious that in all things the temporal agencies are subservient to the ecclesiastical for it is stated in Canon Law No. 3:

"Determination of ecclesiastical matters by the duly constituted authorities of the Church shall be conclusive and binding upon the temporal agencies, even though such ecclesiastical matter directly or indirectly or incidentally affects matters of property, or property rights or authority or any temporal agency of any officer, agent or member of such agency."

Canon Law No. 4 requires that every project, agency and group, as a condition of its authority and right to be a part of the religious society, hold a charter from the ecclesiastical Church government.

The Canon Law seeks to bring the Church within the provision of Section 101(6) and (18) to the end that its income might be exempted, and donors exempted under Section 23(o). Canon Law

No. 10 provides that no part of the income of any property, money or property right, of whatsoever kind or nature "shall ever inure to the personal profit or benefit of any person or persons," and that all income "shall always be used for the religious purposes of this Church." No. 11 prohibits the use of Church property for influencing legislation or for propaganda.

Canon Law No. 22—Definition of "Project" and "Project Managers" insofar as it deals with "projects," is as follows:

"A project is any group, undertaking, or activity in which one or more persons under these canon laws undertakes to apply and illustrate Christianity as taught, construed and defined by the duly constituted Church Government to every day life. A project may or may not be owned in whole or in part by some temporal agency of the Church, or it may be owned by some individual and temporarily dedicated to such such use without affecting, impairing or lessening the ownership of the individual therein."

It appears that in 1946 an agency known as the Elected Delegates Committee was created as a temporal agency of the Church, functioning under a charter from the Church, and handling the Church treasury. This is the agency which we refer to as the "Committee."

## Statutes Involved

As we have analyzed the facts we conclude that in reaching our opinion we are required to construe and apply, or at least comment upon, the following sections of the Internal Revenue Code of 1939:

"§ 23. *Deductions from gross income.* In computing net income there shall be allowed as deductions: * * * (o) Charitable and other contributions. In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of: * * *(2) [as amended by Section 224(a) of the Revenue Act of 1939, c. 247, 53 Stat. 862] A corporation, trust, or community chest, fund, or foundation, created or organized in the United States or in any possession thereof or under the law of the United States or of any state or territory or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation * * * to an amount which in all the above cases combined does not exceed 15 per centum of the taxpayers adjusted gross income * * *. [26 U.S.C., 1952 ed., Sec. 23]"

"§ 25. *Credits of individual against net income.* * * * (b) as amended by Section 10(b) of the Individual Income Tax Act of 1944, c. 210, 58 Stat. 231; Section 102(a) of the Revenue Act of 1945, c. 453, 59 Stat. 556; and Section 201 of the Revenue Act of 1948, c. 168, 62 Stat. 110] Credits for both normal tax and surtax.—(1) Credits. There shall be allowed for the purposes of both the normal tax and surtax, the following credits against net income: * * * (D) An exemption of $600 for each dependent whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $500, * * * (3) Definition of dependent. As used in this chapter the term 'dependent' means any of the following persons over half of whose support, for the calendar year in which the taxable year of the taxpayer begins, was received from the taxpayer: * * * [26 U.S.C., 1952 ed., Sec. 25]"

"§ 101. *Exemptions from tax on corporations.* The following organi-

zations shall be exempt from taxation under this chapter * * *

"(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation; * * *

"(18) Religious or apostolic associations or corporations, if such associations or corporations have a common treasury or community treasury, even if such associations or corporations engage in business for the common benefit of the members, but only if the members thereof include (at the time of filing their returns) in their gross income their entire pro-rata shares, whether distributed or not, of the net income of the association or corporation for such year. Any amount so included in the gross income of a member shall be treated as a dividend received. (26 U.S.C., 1952 Ed., Sec 101)"

It is to be observed that each of the taxpayers, Grassmee and Riker, attached memoranda to their returns which in effect invoked the application of Section 101(18), wherein it was stated that the total net income of the Elected Delegates Committee of the Ecclesiastical Society of Christ's Church of the Golden Rule, an apostolic Religious Association, for the particular tax year was $217,001.54; that this divided between 575 members amounted to $377.39 each. "That this was not received as a dividend, but is reported under Sec. 101(18)."

In her original petition Grassmee invoked the provisions of Section 23(0) and Section 101(6). In her amended petition before the Tax Court she sought to bring herself under the provisions of Section 101(18). Riker's original position was that the earnings of the restaurant were her own and "that your petitioner made gifts of her income during the period covered by her return, to-wit, the taxable year ending September 30, 1948, in the amount of $8,959.11 to said Church for religious purposes only." By her amended petition she took the opposite position that all of the income of the business was "properly the income of the said committee of said Church," and as such not taxable under Section 101(18).

The necessity of passing upon certain of the questions raised by counsel can be eliminated at the outset by determining whether or not the restaurant, Your Food Fountain, operated by Riker, and the income therefrom, was the property of herself, or of the Committee. There has been considerable discussion on this score in the briefs. As we have said the record supports the conclusion that the business as well as the furniture and fixtures used in the business were at all times owned by Riker, and that the earned income was hers. What we have already said on this score would be sufficient but due to the importance of this conclusion we deem it proper to point out some of the straws indicating to us the direction of the wind was toward Riker's ownership.

1. Riker and her husband owned the physical equipment with which the business was opened and thereafter operated.

2. The testimony of Mrs. Huff, a student Minister in the Church, was as follows: "Well, as I recall, Mr. and Mrs. Riker were in business in San Bernardino, and they disposed of that business and took the fixtures from it and purchased this property out on East Base Line and built up the student ministry activity there."

3. The business license was issued at all times in the name of Riker.

4. She was the sole manager of the business and presumably had control of its business policies.

5. There is no evidence in the record that the Rikers ever transferred the business, or any of is assets real or personal, to the Committee or to the Church.

6. There was a summary proceeding in the bankruptcy matter to determine title and ownership to the business.

7. Riker and the trustees entered into an agreement permitting her to operate the business and retain the profits until such time as the question of ownership was determined.

8. The business operated in as many as three separate partnership arrangements between Riker and others, and finally on a percentage basis with a prospective purchaser.

9. Canon Law No. 22 of the Church provides that a project may be owned in whole or in part by the Church, or it may be owned by some individual.

10. Canon Law No. 4 provides that each project shall as a condition of its authority and right to be a part of the religious society, hold a charter from the Church. The record does not indicate that a charter was ever issued to Riker.

11. The theory of private ownership and operation was adopted by Riker in her original tax return and original petition to the Tax Court for redetermination of her tax. In her return she stated that the income from the business for the tax year ending September 30, 1948, was $8,959.11, and that she had contributed the entire sum to the Church.

 Holding, as we do, that the Your Food Fountain business was owned and operated by Riker, that all of the receipts therefrom were hers, it follows that her paying over the entire receipts in the sum of $8,959.11 was a donation to the Church by way of gift. Now, was she entitled to a 15% deduction from her adjusted gross income for the taxable year ending September 30, 1948, under Section 23(o) of the Internal Revenue Code of 1939? The Commissioner refused to allow the deduction and in this was sustained by the Tax Court. Was error committed by the Commissioner and the Tax Court? We think not.

If the claim of both taxpayers for the 15% deduction is to be granted to them under Section 23(o) we must find that either the Church, or the Committee, qualifies under the section. In our opinion neither qualifies as such a religious organization as to render contributions or gifts deductible.

The exact wording of Section 101(6) is found in Section 23(o). It is obvious that there are three conditions precedent which must be met before either section is activated. The organization to which the donation is made must (1) be organized and operated for religious purposes, it (2) must be operated exclusively for such purposes, and (3) no part of its net earnings must inure to the benefit of any private shareholder or individual. As we see it neither the Church nor the Committee meets these three conditions precedent, nor as a matter of fact does it meet any one of them. It is clear that the Committee, an agency entirely controlled by the Church, was created solely for temporal and business purposes, and that the constitution and canon laws contemplated and authorized the Church to engage in temporal and business affairs. The record shows that a wide scope of commercial activities was entered into. The Church was not organized and operated exclusively for religious purposes for the record shows that it operated numerous commercial projects. It also appears that individuals shared in the benefits of its net earnings in that homes and subsistence were provided for them out of the Church treasury. As the Tax Court said, the very means chosen by the Church to attain its spiritual purpose involved engaging in commercial activities through its principal temporal agency, the Committee. The failure of the Church or the Committee to meet any of the three requirements would, and does, foreclose the taxpayers from the Section 23(o) exemption. Even though the Church and its members may have lauded the spiritual end of these enterprises and turned a blind eye to the profits end it remains a fact that much of the lifeblood of the Church came from the profit of purely business ventures.

The Church takes the position that these commercial enterprises were train-

ing centers for its future ministry and as such designated these operations as "Student Minister Training Projects." Further, that by contact with the members of these student minister groups engaged in commercial activities the public generally would come to know and appreciate the principles of the Church. The enterprise conducted by the taxpayer Riker was a restaurant, and just how rapport on matters of religion, and particularly that form espoused by the Church, could be attained by patrons and others dealing with the restaurant is somewhat of a mystery.

The garb of a waiter or cook might cloak a sinner as well as a saint, and the brief and casual relationship between the student ministers and the patrons in and about the restaurant seems to be a poorly designed method to spread the fame of their order. To us it appears that this theory of disseminating knowledge and appreciation of the tenets of unselfishness and the application of the Golden Rule, so much a part of the creed of this particular Church, is questionable from a practical standpoint. We comment thus, not to take issue with the Church doctrine in this respect, but for the more practical purpose of pointing out that so far as the public was concerned, the student ministers were no more than employees of the venture.

That Riker may have "instructed" the student ministers in the faith of the Church is another matter and, as we see it, does not in any manner weaken our position that the restaurant in which they worked was a privately operated commercial establishment. Nor did the fact that the student ministers received no compensation for their labor, or that Riker donated the entire gross receipts of the business to the Church receiving back from it funds with which to pay the cost of operation and the subsistence of herself and the student minister group, make the operation of the restaurant any less a commercial enterprise.

The record sustains the Tax Court which stated in its opinion:

"Our findings of fact show that according to the constitution and canon laws of the Church the Committee was set up to handle temporal affairs of the Church. In carrying out this purpose it operated a restaurant, a laundry, a lumber mill, and various other commercial enterprises, which were its (the Church) principle sources of income during the years in question."

The Tax Court, in its decision, then went on to state:

"In determining whether an entity is organized and orperated exclusively for religious * * * purposes within the meaning of Section 101 (6), Internal Revenue Code of 1939, in order to determine its qualification as a tax exempt organization this Court has denied exemptions to those organizations set up to engage in business activities, despite the fact that the income earned is to go to an exempt organization. So, even if we assume so far as this phase of the case is concerned, that the ecclesiastical society of the Church, the beneficiary of the Committee's earnings under the Church constitution, is a religious organization qualified under Section 23(o), this does not help petitioners."

We are of the opinion, too, as the Tax Court and the Commissioner were, that there is no real distinction between the Committee and the Church. The Committee as such is not mentioned in the constitution or canon law of the Church. It will be observed that Article VI of the constitution provides for the temporal agencies of the Church, and that these agencies "shall be under and subject to the ultimate control by the ecclesiastical authorities of the Church," and it is equally obvious from a reading of the constitution and canon laws that this means under the ultimate control of the Senior Elder, the Church head. The Elected Delegates Committee was created and organized in 1946 under the constitutional and canon law authority. Mrs.

Huff, a Student Minister, testified as follows:

"The Elected Delegates Committee is a temporal agency of the Church and it functions under a charter from the Ecclesiastical Church Government * * * it handles the Apostolic Community's common treasury."

In spite of the verbal dressing the Committee is not a separate entity as the use of the word "chartered" might have one believe for it must answer at all times to the authority of the Senior Elder, his word being final. The Committee, therefore, does not attain the status of a separate legal entity engaged in commercial enterprises the profit of which is turned over to the Church for religious purposes, such as the type of organization engaged in commercial activities for the benefit of a church or charity as we find in the so-called "feeder" situation. It is nothing more than the agent and arm of the Church and its acts are at all times the acts of the Church. This, then, puts the Church directly in business through its agency, the Committee. The line of "feeder" cases and the rules of law therein announced have no application here. Stated in simple language we have present the following situation:

1. Riker owned and operated the restaurant known as Your Food Fountain as a private business for profit;

2. She donated the entire profits to the Church through its agent, the Committee;

3. The moneys so donated were commingled with all other moneys in the treasury of the Committee which was the treasury of the Church;

4. Then out of the Church's treasury there was plowed back into the restaurant business, through the agency of the Committee, sufficient sums of money to pay operation costs;

5. In addition to which further sums of money were advanced for the subsistence of the student minister group and Riker.

It is apparent that the amounts of money allocated to the commercial and religious side of the Church is a matter finally determined by the Senior Elder, who is designated in the Constitution and Canon Law as the spiritual head of the Church, but who by virtue of these same documents is also the controlling head of all of the business and commercial activities of the Church.

We conclude (1) that the Committee was not, and is not, a separate entity but is part and parcel of the Church, the activities of the Committee being those of an agent for its principal; and (2) that the Church itself, being in part engaged in commercial activities and not devoted exclusively to religious matters does not come within the provisions of Section 23(o) permitting its donors to claim the exemption therein provided. By the same token the Church is not itself within the exempt classification contemplated by Section 101(6) so that even if we had found the restaurant venture to have been owned and operated by the Church instead of Riker it still would not be entitled to exemption. And there is still another reason, for to the extent that housing and subsistence were provided by the Church through its Committee, that provision of Section 23(o) to the effect that no part of the net earnings shall inure to the benefit of any private shareholder or individual, has been violated.

█ Taxpayers contend, based on their assumption that Your Food Fountain was a Church project, that Section 101(18) is applicable. Section 101 deals solely with exemptions from tax on corporations, specifying two types. Subsection (6) deals with those organized and operated exclusively for religious, charitable, scientific, literary or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual. This is the type of corporation to which donors may make contributions and receive deductions from their net income to the extent of 15% thereof as provided for in Section 23(o).

Sub-section (18), by its terms, is applicable to "religious or apostolic associations or corporations" having a common or community treasury even though such associations engage in business for the common benefit of the members, if the members include in their gross income their pro rata shares, whether distributed or not, of the net income of the association for such year.

It is obvious that while sub-section (6) organizations are entirely exempt from taxation the effect of sub-section (18), while exempting the organization, merely shifts the taxes to its members who must include it in their pro rata share of the organization income in their separate tax returns. Then, again, it is only a "conditional" exemption for unless the members include their pro rata share of the income of the organization for the year the exemption does not apply, and must be paid in full by the organization.

Whereas we have some guides by way of case law as to the construction and application of Section 101(6) it is not so clear as to Section 101(18) which appears not to have been passed upon by the courts. It would appear, however, to be a fair assumption to say that Congress in adopting this section did intend to meet a new situation taxwise, and not merely to duplicate Section 101(6).

A meager legislative history on (18) refers to "apostolic organizations who have a community interest" and "put in all their property * * * and do a community business, run community farms, and all of the revenue is put in one pot and they are taxed as a corporation." Treasury Regulation 29.101(18)-1 dealing with Section 101(18) requires each association or corporation claiming exemption as a religious or apostolic association or corporation under Section 101(18) to make a partnership tax return on Form 1065. One might assume, then, that Congress intended an association somewhat akin to the ordinary association or partnership in which each member has a definite, though undivided, interest in the business conducted for the common benefit of the members, as

well as a common interest in the community treasury and property. The business and benefit mentioned appears to be something more tangible and worldly than spiritual comfort though the common community enterprise is to be related to or associated with a religious group and doctrine, and being under the aegis of that group. The Church with which we are here concerned would not fall within the exemptive provisions of Section 101(18). However, since we hold that the restaurant was a personal and individual venture rather than a Church activity our comment concerning Section 101(18) comes under the head of gratuitous remarks.

In conclusion we point out that the record supports the findings of the Tax Court in each and every respect, save and except as to what the respondent calls the "fundamental assumption" of the Tax Court that the restaurant business was an asset of the bankrupt Church. As hereinabove stated we find that on this score the record leads to the opposite conclusion, namely, that the business belonged to and was operated by Riker. The taxpayers, Grassmee and Riker, are not, in our opinion, entitled to any of the deductions claimed under Section 23(o), Section 25, Section 101 (6), 101(18).

Before concluding this opinion we feel that the following landmark cases in this particular area of the tax law might well be reviewed.

In John Danz Charitable Trust v. Commissioner of Internal Revenue, 9 Cir., 231 F.2d 673, decided October, 1955, the court was reviewing a decision of the Tax Court. The questions were (1) whether the trust, which was authorized to and did conduct business for profit, was "organized and operated exclusively for * * * charitable * * * purposes," and thus exempt from tax under Section 101(6) of the Internal Revenue Code, simply because the trust fund was payable to such exempt organizations as Danz, one of the grantors, should designate; and (2) whether the trust income for the taxable years, not actually paid

to charitable organizations during the taxable years, was, pursuant to the trust instrument, "permanently set aside" for charitable purposes during the taxable year and thus deductible under Section 162(a) of the Code.

The court said that the trustees were not intended to act as a religious or charitable institution. The trust agreement provided that when designations were made for charitable, religious, etc., purposes, they were to be made only to tax exempt organizations under Section 101, and also of the type specified in Section 23(o) so that the contribution to such beneficiary would be deductible from income and exempt from estate and gift tax. During the years following the creation of the trusts various forms of speculative and profit producing businesses were engaged in.

The Tax Court held that being trusts they were not exempt under Section 101 (6), nor entitled to the exemption under Section 162(a).

The Court at page 675 referred to its opinion in Ralph H. Eaton Foundation v. Commissioner of Internal Revenue, 9 Cir., 219 F.2d 527, citing therefrom as follows:

"The articles state that the purpose of the corporation is to foster and promote religious, charitable and educational enterprises, and that it does not contemplate pecuniary gain or profit to the members thereof. Clearly, however, the corporation itself was not intended to operate and did not operate as a religious, educational or charitable institution. What was purposed was only that the profits from its various business activities would be turned over to such institutions. In a word, petitioner is a 'feeder' corporation whose principal activities have not the remotest connection with any religious, charitable or educational enterprise. * * * The record shows that it engaged actively and exclusively in various commercial or business enterprises, namely, farming, selling of real estate lots, the selling of sports clothes, and in a construction business. * * * All of the latter had to be and were engaged in activities which carried out the purposes and ideas for which petitioner had been established. * * * But assuming the function of turning over the profits was an activity or operation it certainly was not the principal one. We agree with the Fourth Circuit (United States v. Community Services, 189 F.2d 421) that the word 'exclusively' as used in the statute must be given effect."

In commenting upon the word "exclusively" as used in Section 162(a), Title 26, U.S.C.A., the court in the Danz case said:

"If exemption is sought under the second clause, the attempt is futile. Otherwise, no meaning is given to the word 'exclusively.' It is plain that these funds, when mingled with the funds of private trusts for business or speculative purposes and considering the risk of loss, were not used exclusively for religious, charitable or other like purposes. * * * The mere fact that the remaining funds, after partial or complete recapture from the channels of business or the marts of trade, whenever in a future more or less removed, in the discretion of the trustees, they chose to pay these over, would necessarily be paid to institutions defined as charitable, does not satisfy the statute. There is another circumstance which compels consideration. John Danz, as settlor, was under no compulsion to exercise his power to designate charitable beneficiaries. If he failed to do so, the funds might during his life have been devoted 'exclusively' to business ventures and commercial pursuits."

In speaking of the "ultimate destination" test this court said in the Danz case:

"The 'ultimate destination' test is applicable in strictness to other phrases of the statute. It is not

repudiated under circumstances which call for its application. But here an attempt to force the facts to fit the doctrine does violence to the language of the statute."

The court commented further on the word "exclusively":

"It is difficult to see how a fund is to be 'exclusively' devoted to charitable purposes in any event if a part of it is to be used year after year for speculative and business ventures in conjunction with funds which redound to the profit of private individuals. Money is not 'used' for charitable purposes when thus traded with. When any portion of this fund is so used, it would be a contradiction in terms to say that it was devoted 'exclusively' to charitable purposes.

"* * * But here, 'exclusively' means that the fund cannot be devoted to any other purpose, but the portion claimed as exempt must be 'paid or permanently set aside' during the 'taxable year' to a particular charity."

In his dissent in the Danz case Judge Pope pointed out that this case was to be determined under Section 161 and the deductions allowed under Section 162(a), and not under the provisions of Section 101(6) under which section the Eaton Foundation case, supra, was decided. Said Judge Pope:

"A difference in phraseology in Sec. 101(6) and Sec. 162(a) suggests a different congressional intent with respect to corporations and foundations on the one hand and trusts on the other. Sec. 101(6) which commanded the decision in the Eaton Foundation case refers to corporations or foundations 'organized and operated exclusively for religious, charitable', etc. purposes. The words which I have italicized appear to me to be key words. Because Eaton Foundation was not operated exclusively for charitable purposes, it was not entitled to the exemption claimed."

The case of Ralph H. Eaton Foundation v. Commissioner of Internal Revenue, 9 Cir., 219 F.2d 527, 528, was decided in February of 1955. The question there presented was whether a corporation engaged in ordinary business activities for profit is entitled to exemption under Section 101(6) solely by reason of the fact that its profits are payable to religious, charitable or educational enterprises. The charter of the corporation stated that its purpose was to foster and promote religious, charitable and educational enterprises without pecuniary gain or profit to the members. Citing:

"Clearly, however, the corporation itself was not intended to operate and did not operate as a religious, educational or charitable institution. What was purposed was only that the profits from its various business activities would be turned over to such institutions. In a word, petitioner is a 'feeder' corporation whose principal activities have not the remotest connection with any religious, charitable or educational enterprise."

Commenting on the "ultimate destination" test the court said:

"The Ninth Circuit has not gone overboard in its application of this statute [Section 101(6)] Cf. Bear Gulch Water Co. v. Commissioner, 116 F.2d 975. In the more recent case of Squire v. Students Book Corporation, 9 Cir., 191 F.2d 1018, 1020, we held that an incorporated book-store which was owned or entirely controlled by Washington State College and whose earnings were devoted solely to the purposes of that institution was exempt under § 101(6). We observed that the court had not committed itself to the ultimate destination test frequently applied elsewhere. We said that 'Resolution of the case before us does not depend wholly on the ultimate destination of the taxpayer's profits. The business enterprise in which taxpayer is engaged obviously

bears a close and intimate relationship to the functioning of the College itself.'

"A number of the circuits have given the statute very broad or liberal scope, applying in cases more or less analogous to the present what is known as the ultimate destination test. At this late date no useful purpose would be served by dwelling on those decisions. The bulk of them are cited and to a degree analyzed by the Fourth Circuit in United States v. Community Services, 189 F.2d 421, 424, certiorari denied 342 U.S. 932, 72 S.Ct. 375, 96 L.Ed. 694, where the ultimate destination test was rejected. The court, speaking through Judge Dobie, thought that the taxpayer involved was in effect organized and operated for two purposes: (1) to engage in commercial business for profit, and (2) to turn over the profits realized from those commercial activities to charitable organizations. It is said that 'the second purpose is charitable; the first purpose clearly is not. To qualify for the exemption here, the corporation must be "organized and operated *exclusively* for \* \* \* charitable \* \* \* purposes." ' "

In affirming the Tax Court in denying the exemption to the taxpayer the court, in the Eaton Foundation case, concluded:

"In the case before us it would appear that none of the activities in which petitioner actually engaged was charitable or religious. All were of a business or commercial nature. But assuming the function of turning over the profits was an activity or operation it certainly was not the principal one. We agree with the Fourth Circuit that the word 'exclusively' as used in the statute must be given effect."

Another Ninth Circuit case is Squire v. Students Book Corp., 191 F.2d 1018, 1020. The court affirmed the Tax Court holding that the exemption applied under the facts of this case. The court pointed out that since the decision in

Roche's Beach, Inc., v. Commissioner, 2 Cir., 96 F.2d 776, most of the circuits confronted with this type of problem "appear" to have applied the "ultimate destination" test in determining whether the profits are exempt under Section 101(6),

"or [as the 2nd Circuit court said], to put the matter another way, if the only purpose of the enterprise is to devote its profits to charitable or educational ends the exemption has been usually held to attach. It has been thought that the exemption, unlike exemption statutes generally, should be liberally construed because of the gain to the public through the encouragement of charity. In two very recent decisions, reaching opposite conclusions, namely, United States v. Community Services, 4 Cir., 189 F.2d 421, and C. F. Mueller Co. v. C. I. R., 3 Cir., 190 F.2d 120, the subject has been extensively reviewed and the authorities cited and discussed. We think it unnecessary again to plow this field, more particularly since Congress in the Revenue Act of 1950 has declared a different rule applicable for taxable years commencing after December 31, 1950."

Here again the Ninth Circuit disavowed the adoption of the ultimate test theory as the sole test, even though in Smyth v. California State Automobile Ass'n, 9 Cir., 175 F.2d 752, it appeared that the court had given this test its tacit approval. It is apparent that the Circuit insists on maintaining its independence for in deciding the Students Book Corporation case it said:

"Resolution of the case before us does not depend wholly on the ultimate destination of the taxpayer's profits. The business enterprise in which taxpayer is engaged obviously bears a close and intimate relationship to the functioning of the College itself. In some of the cases adhering to the general rule no similar relationship is discernible. \* \* \* All things considered, we

are not disposed to hold that the trial court was wrong in its disposition of the case."

United States v. Community Services, Inc., 189 F.2d 421, 425, was a Fourth Circuit case decided in 1951. In this case it was held that a nonstock membership corporation, a charitable corporation under the laws of that state of incorporation, operating for the convenience of the employees of a textile manufacturing company operating canteens, coal and wood yards and other services, with no sales to the general public, was not entitled to the claimed exemption, as it was not "organized and operated exclusively for charitable purposes." The exemption was claimed under Section 1426(b) (8) the wording of which is identical with Section 101(6). The court pointed out that there were three conditions to be met in order to come under the provisions of the section, namely: (1) the corporation must have been "organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes; (2) no part of net earnings of which inures to benefit of any private shareholder or individual; and (3) no substantial part of activities of which is carrying on propaganda, or otherwise attempting, to influence legislation." Citing from page 424:

"The long-standing implementing Treasury Regulations (Sec. 402.215 of Regulations 106) make it clear that these requirements constitute separate conditions precedent to exemptions, each of which must be met."

The court said that Community Services met the second and third requirements, and then—

"It is the first condition, namely, that the corporation be 'organized and operated exclusively for religious, charitable, scientific, literary or educational purposes' with which we are concerned."

It was found that this first condition was not met by Community Services, and that the taxpayer was organized only for the purpose of engaging in commercial businesses, then to turn over its profits to charitable organizations. "To qualify for the exemption here the corporation must be 'organized and operated *exclusively* for * * * charitable * * * purposes'" said the court, citing the following from the Better Business Bureau of Washington, D. C. v. U. S. case, 326 U.S. 279, at page 283, 66 S.Ct. 112, at page 114, 90 L.Ed. 67:

"This plainly means that the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes."

Citing again from the Community Services decision 189 F.2d at page 425:

"For tax-exemption purposes, the charitable nature of the distributees of its income cannot be attributable to the taxpayer. The corporation earning the income and claiming the exemption, rather than the recipients of the income, must be organized and operated exclusively for charitable purposes. Otherwise a purely commercial corporation could claim the exemption, if all its stock were owned by an exempt corporation, which would receive, as dividends, all the net earnings of the commercial corporation. Clearly this is not the law. [Cases cited] * * * Manifestly, a corporation, engaged in commercial activities, if exempt from federal taxes, would have a tremendous economic advantage over competitors in the same field. Such a corporation could effectively eliminate competitors, actual and potential, since it could undersell corporations, whose earnings are subject to diminution by federal taxation. It is difficult to believe that Congress intended to countenance such a situation."

The district court, in Community Services, pointed out that in construing this type of exemption statute the statute should be construed broadly and liberally to effect its beneficial purpose, encour-

agement of charity, religions, education. While the Circuit Court did not expressly repudiate this rule of construction, it did so impliedly referring again to the language of Justice Murphy in the Better Business Bureau case, 326 U.S. 279, at page 283, 66 S.Ct. 112, at page 114:

"Even the most liberal of constructions does not mean that statutory words and phrases are to be given unusual or tortured meanings unjustified by legislative intent or that express limitations on such an exemption are to be ignored."

The court in Community Services, 189 F.2d at page 426, discusses the 1950 amendment to Section 101 which provides that an organization operated for the primary purpose of carrying on a trade or business for profit will not be exempt under the provisions of this section "on the ground that all of its profits are payable to one or more organizations exempted under this section from taxation." Reference is also made to House Report No. 2319, 81st Congress, 2nd Session, pages 36–37, 41–42, which contains a rather interesting discussion on the purpose of the amendment. The committee pointed out that several of the circuits, citing cases, had already interpreted and applied Section 101(6) as though it contained the proposed amendment, which was adopted in 1950. The excerpt from the Committee report concludes:

"The amendment is intended to show clearly what, from its effective date, the rule is to be, without disturbing the determination in present litigation of the rule of existing law."

At page 427 of 189 F.2d of the Community Services case the court discusses the often cited and relied upon decision in the Trinidad v. Sagrada case, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458, in which it was held that the corporation, itself a religious institution, in selling wine and other articles was doing so as an incident to its religious work; and that such activities "do not amount to engaging in trade in any proper sense of the term." Referring to the Trinidad case, the Community Services court said, that the force of the Trinidad case has been weakened, in addition to the facts of the case, by more recent decisions of the courts.

The decision of the Tax Court is affirmed.

DENMAN, Chief Judge.

I concur in the holding that Mrs. Riker operated the Your Food Fountain in her own interest and that the decision of the Tax Court that she is taxable on its income be affirmed.

I also concur in the holding that Mrs. Grassmee's income from her earnings is taxable and that she is not entitled to a deduction for the dependency of her mother.

I further concur in the holding that neither taxpayer is entitled to a charitable deduction for her contributions to the church corporation under 26 U.S.C. § 23(o) providing for deduction for gifts to it if no part of its net earnings "inure to the benefit of any private shareholder or individual," since the church in fact supports its members it is not such a religious corporation.

I concur in affirming on the above grounds.