Ralph M. Singer and Estate of Marion J. Singer, his wife, Ralph Marvin Singer, Jr. and Frank Fernholz, Executors v. Commissioner.
Ralph M. Singer & Estate of Marion J. Singer v. Commissioner
Docket Nos. 93505, 1881-62.
United States Tax Court
T.C. Memo 1963-158; 1963 Tax Ct. Memo LEXIS 187; 22 T.C.M. (CCH) 759; T.C.M. (RIA) 63158; June 7, 1963
Frank Fernholz, 105 W. Adams St., Chicago, Ill., and John L. Carey, for the petitioners. Delman H. Eure and Seymour I. Sherman, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in the petitioners' income tax as follows: Docket No. 93505 Petitioners
Year
Deficiency
Ralph M. Singer and Estate of
Marion J. Singer, his wife,
etc.
1954
$ 33,415.05
1955
86,357.08
1956
130,884.18
*188 Docket No. 1881-62 Petitioners
Year
Deficiency
Ralph M. Singer and Estate of
Marion J. Singer, his wife,
etc.
1958
$ 41,448.88
1959
94,299.68 In his answer in Docket No. 1881-62 the respondent claimed additional deficiencies for 1958 and 1959 in the respective amounts of $6,010.17 and $5,537.88. The issues are (1) whether the gain realized by petitioners from the sale of their stock in three corporations is taxable as long-term capital gain or as ordinary income, and (2) whether petitioners are entitled to a nonbusiness bad debt deduction of $40,645.16 in the year 1954. Findings of Fact Some of the facts were stipulated and they are so found. Ralph M. Singer and Marion J. Singer were husband and wife during the years before us and were residents of Los Angeles, California. They filed joint Federal income tax returns for the years 1954, 1955, 1956, 1958 and 1959 with the district director of internal revenue at Los Angeles, California. Marion J. Singer died a resident of Los Angeles on June 18, 1960. Ralph M. Singer was 74 years old at the time of the trial. Ralph will hereinafter be called the petitioner. Prior to 1939 petitioner was employed *189 in Detroit by Evans Products Company, which was in the lumber business (Western Division) and was also engaged in the manufacture of automotive products. Petitioner was connected with the lumber end of the business and about 1939 was transferred to the west coast with an office in Los Angeles. Petitioner resigned as vice-president from the Evans Products Company about the year 1947. He continued to maintain an office in Los Angeles for various interests. At the time of trial petitioner had been in the lumber business for more than 50 years. Loyola University Foundation, a California corporation, was organized in 1945 for the stated purpose of obtaining funds for Loyola University of Los Angeles. On October 1, 1952 the name of the corporation was changed to University Hill Foundation. This corporation will hereinafter be called the Foundation. On November 19, 1946 the respondent ruled that the Foundation was exempt from income tax under section 101 (6) of the Internal Revenue Code of 1939. The exemption was revoked effective with its fiscal year ended April 30, 1952 by a ruling letter to the Foundation dated April 4, 1956. The reason given for the revocation was that the Foundation *190 was being operated primarily for business purposes and not for the purposes prescribed in section 101(6) of the Internal Revenue Code of 1939. Lakeview Moulding Co. was a partnership formed in January 1945 and consisted of the following partners: Truman W. Collins, Alton M. Collins, J. T. McDonald and J. H. Dalen. Lakeview Manufacturing Co. (hereinafter called Lakeview) was a Nevada corporation organized on May 6, 1946 to acquire the assets and business of Lakeview Moulding Company. On May 20, 1946 the three partners and the executrix of the fourth partner executed a warranty deed transferring certain real property to Lakeview, and a bill of sale conveying certain personal property to petitioner and J. M. Nordstrom, Jr. The total consideration received by the transferors for both transfers was $400,000. Petitioner and Nordstrom then transferred the personal property to Lakeview, effective June 1, 1946, under a bill of sale executed on June 6, 1946. On about June 1, 1946 petitioner acquired 1,100 shares of Lakeview stock at a cost of $76,881.76. On May 31, 1947 the outstanding capital stock of Lakeview was held as follows: petitioner, 1,100 shares; J. M. Nordstrom, Jr., 500 shares; *191 Fitz M. Binnion, 200 shares; and J. V. Foreman, 200 shares. On May 31, 1947 Nordstrom, Binnion and Foreman, as "Settlors", and petitioner, as "Trustee", executed a trust agreement under which the three "Settlors" transferred their 900 shares of Lakeview stock to petitioner, as "Trustee". The trust agreement stated that the purpose of the transfer was to make possible the sale of said 900 shares of Lakeview stock to the Foundation. The consideration for the 900 shares so transferred and to be sold was $585,000. On the same date the petitioner, as "Seller", and the Foundation, as "Buyer", executed a sales agreement under which petitioner sold all of the outstanding Lakeview stock (2,000 shares) to the Foundation for $1,300,000. The sales agreement stated that it was the intention of the Foundation to immediately liquidate Lakeview and to execute a lease to an operating company (to be selected by the Foundation) to operate the business formerly operated by Lakeview. The sales agreement also stated that the lease to the operating company would provide for the payment to the Foundation of a rental equivalent to 80 percent of the net profits from the operation of the business until a total *192 rental of $1,625,000 had been paid, at which time the rental would be reduced to 60 percent of net profit. The Foundation agreed to pay to petitioner, as "Seller", to apply to the purchase price of the stock, 90 percent of the gross rental received by the Foundation under the lease. The sales agreement provides that the "payment to Seller of the aforesaid purchase price of said stock shall be payable only out of the gross rental * * *, or if Buyer elects to operate said business itself, then on the basis of said percentage of said net profits derived by the Buyer from the operation of said business, or in the event that Buyer shall elect to sell said business and its assets, or any of them, it shall apply the full proceeds of the selling price to retire the aforesaid purchase price of said stock; provided however, that in no event shall said business or assets be sold by Buyer except with the written consent of Seller." On May 31, 1947, petitioner and the Foundation executed an amendment to the sales agreement under which the purchase price was reduced by $66,664.64. The reduction was due to an incorrect valuation placed upon a sawmill which had been listed as an asset in Lakeview's *193 balance sheet (attached to the original sales agreement) at a net book value of $110,164.64 instead of $43,500. A representative of the Foundation had inspected the Lakeview plant before the Foundation decided to purchase the Lakeview stock. On May 31, 1947 a lease was executed by the Foundation, as lessor, and Frank Fernholz, as lessee, under which certain real and personal property was leased for a term of 20 years. The lssee was also given the right to use Lakeview's name in conducting the business contemplated by the lease. The rental provisions were geared to the provisions of the sales agreement outlined above. On the same date Fernholz, as lessee, executed an assignment of the lease to a partnership formed on May 31, 1947 which was called the Lakeview Manufacturing Co. and consisted of the following partners: petitioner, Nordstrom, Binnion, Foreman and Fernholz. The partnership was to conduct the business of manufacturing lumber mouldings. The May 31, 1947 partnership agreement provided that the partnership would last until January 31, 1949, and that on or before that date either (1) a corporation would be organized to succeed to the assets and business of the partnership, *194 or (2) the partners (other than Nordstrom) would purchase from Nordstrom his partnership interest and give Nordstrom a five-year employment contract at $10,000 per year. The partnership agreement provided that petitioner would receive 5 percent of the gross sales plus an additional $500 per month as compensation for sales promotion and supervisory services to the partnership. The compensation to be paid for sales promotion or managerial services to Nordstrom and Binnion was $500 per month and $1,250 per month, respectively. The partnership net profits were to be divided as follows: Petitioner
42 percent
Nordstrom
22 percent
Binnion
15 percent
Foreman
15 percent
Fernholz
6 percent
On January 31, 1948 a new partnership agreement was executed establishing a new partnership as successor in interest to the business operations of the Lakeview Manufacturing Co. The partners were the same as in the old partnership, with the exception of Nordstrom. The new partnership agreement, in addition to the compensation provisions for the managerial and other services of petitioner and Binnion, provided for a division of net profits as follows: Petitioner
51 percent
Binnion
23 percent
Foreman
19 percent
Fernholz
7 percent
*195 Several other documents were also executed on May 31, 1947 to carry out the ultimate transfer of Lakeview's business operations to the newly created operating company. Lakeview was liquidated on May 31, 1947. No change occurred on or immediately after May 31, 1947 in the actual personnel or business operations theretofore carried on by Lakeview. Clark County Lumber Company was a Washington corporation organized on September 18, 1945, with the following incorporators: Charles A. Dickinson, 30 shares; J. Walter Copp, 10 shares; and Merton J. Pugh, 10 shares. The corporation, hereinafter called Clark of Washington, had its principal business office in Vancouver, Washington, and was engaged in the business of manufacturing venetian blind slats and similar items. In January and March 1946 petitioner acquired 500 shares of stock in Clark of Washington at a cost of $50,000. Clark County Lumber Company was a corporation organized on June 21, 1947, under the laws of the State of Illinois. The corporation, hereinafter called Clark of Illinois, also had its principal office in Vancouver, Washington. On June 30, 1947, after negotiations had lasted from three to four months, a sales agreement *196 was executed between petitioner, as seller, and the Foundation, as buyer, under which the Foundation agreed to purchase all the outstanding stock in Clark of Washington for a total purchase price of $210,000, with $35,000 payable upon execution of the agreement. The sales agreement stated that the Foundation would immediately liquidate Clark of Washington and execute a lease to an operating company which would operate the business formerly operated by that corporation. The lease was to provide for payment to the Foundation of a rental equivalent to 80 percent of the net profits from the operation of said business until a total of $310,000 had been paid, at which time the rental would be reduced to 60 percent of net profits. The Foundation was to pay to petitioner, as seller, to apply toward the purchase price of the stock 60 percent (to be subsequently reduced to 50 percent) of the gross rental received by the Foundation under the lease. It was further agreed under the sales agreement that the Foundation would lease to the operating company all the fixed assets and sell to the operating company all the current assets received by the Foundation upon the liquidation of Clark of Washington. *197 A balance sheet attached to the June 30, 1947 sales agreement shows that Clark of Washington, as of June 30, 1947, had current and fixed assets of $160,509.69 and current liabilities of $55,080.83, with a net worth of $105,428.86. On June 30, 1947 the following transactions also occurred: 1. The Foundation purchased from petitioner, as trustee, certain real property located in Clark County, Washington, for a total purchase price of $100,000, with $15,000 payable immediately, and the balance to be paid from a designated percentage of the rentals received by the Foundation under the lease to the operating company. 2. The Foundation liquidated Clark of Washington. 3. The Foundation leased to Clark of Illinois the real property acquired from petitioner, as trustee, together with certain personal property installed and located on said property. The rental provisions of the lease carry out the pertinent provisions of the sales agreement recited above. 4. As security for its obligations to petitioner, the Foundation (a) assigned to him the lease to the operating company; (b) executed a chattel mortgage on the fixed assets and other personal assets located in the mill formerly *198 owned by Clark of Washington; (c) executed a mortgage on the real property which had been purchased by the Foundation from petitioner, as trustee. 5. A sales agreement was executed by the Foundation and Clark of Illinois under which the latter corporation agreed to purchase certain personal property acquired by the Foundation upon the liquidation of Clark of Washington. No change occurred in the personnel, location or business operations formerly carried on by Clark of Washington as a result of the above transactions. On April 26, 1951 the petitioner advanced $40,645.16 to Clark of Illinois to enable the corporation to pay an outstanding bank loan. Petitioner at that time was a stockholder in Clark of Illinois. In 1955 the petitioner recovered $12,218.33 from Clark of Illinois on account of the 1951 advance. When Clark of Illinois was dissolved in May 1956 all of the creditors of the corporation were paid, but petitioner received no further payment on account of his 1951 advance. Clark of Illinois incurred a net loss from operations of $36,666.19 in the fiscal year ended May 31, 1954 and a net loss from operations of $16,917.87 in the fiscal year ended May 31, 1955. On May 3, 1955 the *199 Foundation and the Willis Manufacturing Company, a Washington corporation, executed a contract under which the corporation purchased the real property upon which Clark of Illinois had conducted its business operations as well as the personal property located thereon. The purchase price was $50,000, payable over a period of years. On May 1, 1955 the petitioner, both individually and as trustee, agreed to the terms and conditions of the above conditional sales contract and agreed to accept the full net proceeds of said conditional sales contract in full satisfaction of the outstanding liability of the Foundation to him, individually and as trustee. On May 1, 1955 the Foundation and Clark of Illinois canceled the lease of June 30, 1947. Clark of Illinois was formally dissolved by a certificate of dissolution filed on May 3, 1956. On August 31, 1956 the Foundation assigned to petitioner, individually and as trustee, all of its right, title and interest under the May 3, 1955 conditional sales contract. Trinity County Timber Company, an Illinois corporation, was organized on February 4, 1947 with its principal business office at Redding, California. The corporation will hereinafter be *200 referred to as Trinity County. On November 13, 1952 the outstanding capital stock of Trinity County was held as follows: Shareholder
Shares
Petitioner
385.75
Joyce V. Foreman
20.25
Fitz M. Binnion
101.25
James M. Wells
40.50
Gordon Buck
40.50
Curtis Smith
20.25
Frank Fernholz
26.325
Frank Fernholz, trustee
81.00 *
Ralph M. Singer, Jr.
80.00
Carleton M. Tower
14.175
Total
810,000
Moore-Hart Lumber Company and South Fork Timber Company were Nevada corporations. The principal asset of South Fork Timber Company consisted of about 13,000 acres of timberlands which, in 1947, it owned or was in the process of acquiring in northern California. Moore-Hart Lumber Company owned a partially completed sawmill. On February 16, 1947 Trinity County acquired 20,888 shares (25,000 shares outstanding) of stock of the South Fork Timber Company and all 800 outstanding shares of stock of the Moore-Hart Lumber Company. The same stockholders controlled both the South Fork Timber Company and the Moore-Hart Lumber Company. The purchase price for the stock of South Fork Timber Company was based, in part, upon an estimate *201 by the sellers of the stock that the corporation's timberlands contained about 260 million board feet of merchantable timber of all species, except hard woods, at $2.25 per thousand board feet. The purchase price for the 800 shares of Moore-Hart Lumber Company stock was $80,000, and for the 20,888 shares of South Fork Timber Company stock, approximately $385,000. The agreement of February 16, 1947 also provided for an adjustment, either downward or upward, in the purchase price of the South Fork Timber Company stock if the estimate of the amount of timber on its various properties proved incorrect. The purchase price was payable in installments. During the negotiations with the shareholders of South Fork Timber Company it was made clear by them that in order to acquire the timberlands in question it would be necessary for Trinity County to also purchase the stock of Moore-Hart Lumber Company. After the stock purchase, Moore-Hart Lumber Company was dissolved in May 1947 and its partially completed sawmill was sold. After the purchase by Trinity County of the stock of South Fork Timber Company, petitioner made several attempts through early 1950 to sell the timber or otherwise exploit *202 it. American Forest Products Co. was one of the potential buyers of the timber approached by petitioner. Petitioner offered to sell the timber to this corporation at $5 or $6 per thousand board feet, then raised the price to $8 or $9 per thousand board feet when he became convinced that the quality and extent of the timber owned by South Fork Timber Company exceeded his earlier estimates. Trinity Alps Lumber Company (hereinafter called Trinity Alps), a California corporation, was a wholly-owned subsidiary of AmericanForest Products Co. On February 13, 1950 Trinity Alps and South Fork Timber Company executed an agreement called a "Cutting Contract" under which Trinity Alps contained the right to cut timber on the South Fork Timber Company lands and agreed to devote its entire facilities to logging and processing timber cut from these lands. Trinity Alps agreed to make payments as follows: [Trinity Alps] agrees to pay the sum of Three Dollars * * * per thousand * * * feet, board measure, log scale, for all selected logs cut and removed hereunder of whatever species. This payment is the base stumpage herein referred to, and shall constitute the minimum stumpage price which [South *203 Fork Timber Company] shall receive for all such logs. In addition, Trinity Alps agreed to pay to South Fork Timber Company one-half of the net profit (as computed under the contract) realized by Trinity Alps when the cut timber was sold as dry lumber. On October 31, 1950 South Fork Timber Company assigned its rights under the "Cutting Contract" to Trinity County. South Fork Timber Company was dissolved effective October 31, 1950. In a letter ruling dated June 15, 1951 the respondent stated that "the contract between South Fork Timber Company and Trinity Alps Lumber Company qualifies under Section 117(k)(2) of the Internal Revenue Code as a contract for the sale of standing timber wherein the owner retains an economic interest in the timber. Accordingly if the liquidation of the South Fork Timber Company qualifies under Section 112(b)(6) the parent Trinity County Timber Company, which now owns the contract, would be entitled to the provisions of Section 117(k)(2)." In June 1952 Trinity County borrowed $600,000 from Travelers Insurance Company, a Connecticut corporation, and executed a promissory note in such amount payable over a period of about 10 years *204 and bearing interest at 6 percent. Trinity County also executed a deed of trust as security for the loan. After the $600,000 loan was obtained from the insurance company, petitioner undertook negotiations for the sale of Trinity County to the Foundation, and on November 13, 1952, after protracted negotiations, the stockholders of Trinity County and the Foundation executed a purchase contract and a supplemental agreement under which the Foundation agreed to purchase the 810 outstanding shares of stock of Trinity County for a total purchase price of $2,997,000. After an initial down payment of $202,500, the balance of the purchase price was to be paid over a period of several years in accordance with a schedule outlined in the purchase agreement. The schedule provided for a minimum payment of $81,000 each year, and in addition to said minimum payment, an amount equal to 90 percent of the net income from the timber properties, with certain adjustments. Petitioner's 385.75 shares of stock, all of which were acquired by him prior to 1951, were purchased by the Foundation for $1,427,275. A balance sheet prepared from the Foundation records as of April 30, 1952 showed that the net worth *205 of the Foundation as of that date was $7,236,174.09. On November 13, 1952 the Foundation liquidated Trinity County and on that same date the Trinity Alps "Cutting Contract" was assigned by Trinity County to the Foundation. Petitioner has never had any economic interest in the Foundation, apart from his right to the selling price of his stock, and has never held any office in the Foundation. By the year 1962 petitioner had been paid the full selling price of his Trinity County stock by the Foundation, plus interest of $134,458.81. From 1952 through the year 1961, about 288 million board feet of timber were removed from the Foundation timber properties, and at the beginning of 1962 there remained about 110 million board feet of timber on the land. From 1953 through 1961 the Foundation received $3,649,315 from the sale of the timber. Petitioner reported the payments received from the Foundation on account of the sale in 1952 of his 385.75 shares of Trinity County stock on the installment basis as capital gains, as follows: Long-term
Amount
Proportion-
Capital Gain
Year
Received
ate Basis
realized
1954
$ 61,050.00
$1,778.69
$ 59,271.37
1955
192,750.61
5,615.79
187,134.82
1956
280,991.41
8,186.68
272,804.73
1958
113,819.06
3,316.12
110,502.94
1959
223,452.83
6,510.30
216,942.53
*206 Respondent determined that total payments, without any reduction for basis, received by petitioner from the Foundation in 1954, 1955 and 1956 in connection with the Trinity County stock sale were taxable as ordinary income in the respective years, but for the years 1958 and 1959 the respondent determined that the amounts includable in ordinary income were $110,502.94 and $216,942.53, respectively, which represented the total payments less deductions for stock basis. In his answer filed in Docket No. 1881-62 the respondent alleged that the amounts of $3,316.12 and $6,510.30, the amounts subtracted by petitioner as stock basis in 1958 and 1959, should also be taxable as ordinary income for the years 1958 and 1959, respectively. Petitioner also elected to report the gain realized from the sale of his Lakeview stock in 1947 and Clark of Washington stock in 1947 on the installment basis and reported the payments received from the Foundation as follows: Amount of
long-term
capital gain
Year
Amount Received
realized
1955
$ 2,200.00 (Lakeview)
$1,963.44
7,383.87 (C. of W.)
5,625.81
1956
1,375.00 (Lakeview)
1,227.15
7,790.32 (C. of W.)
5,935.48
1958
128.62 (Lakeview)
114.79
10,108.44 (C. of W.)
5,077.83
*207 Respondent determined that the total payments, without any reduction for basis, received by petitioner in connection with his sale of the Lakeview stock and Clark of Washington stock were taxable as ordinary income, but for the year 1958 the respondent determined that the amounts includable in ordinary income were $114.79 (Lakeview) and $5,077.83 (C. of W.), representing total payments less deductions for stock basis. In his answer filed in Docket No. 1881-62 the respondent alleged that the amounts deducted as basis in 1958 ($13.83 for the Lakeview stock and $5,030.61 for the Clark of Washington stock) should also be taxable as ordinary income in 1958. Petitioner claimed a nonbusiness bad debt deduction of $40,645.16 in his 1954 return in connection with the advance made by him to Clark of Illinois in 1951. Respondent disallowed this deduction in full. Opinion Petitioner argues that the three transactions in which he sold his stock in Lakeview, Clark of Washington and Trinity County to the Foundation, were bona fide sales and that the gains realized by him are taxable as long-term capital gains. Respondent's main argument is that these sales were a sham and must be disregarded *208 and that the payments received by petitioner from the Foundation are taxable, in their entirety, as ordinary income. Both parties at the trial recognized that the fact pattern in our recently decided case, Clay B. Brown, 37 T.C. 461 (on appeal CA-9) is similar to the Lakeview and Clark of Washington stock sales to the Foundation, since both involved liquidation of the old corporation by the Foundation followed by a lease of the property to a newly-formed operating group (for a 20-year period) in which the petitioner retained an interest. Respondent, in effect, takes the position that the Brown case was wrongly decided and urges us to reconsider the position there adopted by the Court. After this case was tried, this Court decided two more cases in which the factual pattern was similar to that in the Brown case and in both cases we sustained the validity of the transactions. Anderson Dairy, Inc., 39 T.C. - (March 26, 1963); Royal Farms Dairy Co., 40 T.C. - (April 29, 1963). See also Emanuel N. (Manny) Kolkey, 27 T.C. 37, affirmed 254 F. 2d 51; Union Bank v. United States, 285 F. 2d 126 (Ct. Cl.). In the Anderson Dairy case, the *209 Royal Farms Dairy case and the Union Bank case, the transactions were quite similar to the Lakeview and Clark of Washington transactions in the instant case and involved the same tax-exempt organizations as here, and we can perceive no substantial difference between the two transactions in this case and the other cited cases. Respondent treats the Trinity County transaction the same as the Lakeview and Clark of Washington transactions in his argument that the transactions lack validity. But respondent's argument is even less persuasive in the Trinity County sale of stock to the Foundation, since the transaction did not involve a lease of the property by the Foundation to a newly formed operating company in which the seller had an interest. Instead, the Foundation liquidated Trinity County and collected payments over a period of years from Trinity Alps, which corporation had in 1950 obtained the right under a "Cutting Contract" to log and process timber from the Trinity County timber properties. We conclude, on the basis of all the evidence, that the sale of the Trinity County stock by petitioner to the Foundation was bona fide. Negotiations between the parties over the purchase *210 price were protracted, and the final purchase price was not grossly excessive. Petitioner, who had spent a life-time in the lumber industry, testified that when Trinity County originally acquired the timber property in question (by purchasing the South Fork Timber Company stock), the purchase price of the stock was predicated on a estimated 260 million board feet of lumber at $2.25 per thousand board feet, but it was petitioner's opinion that the timber on this property was "around 350 to 400 million feet" and that it was "worth from 10 to 13 dollars a thousand, in my opinion." It is significant that by the year 1962, after the Foundation had paid to petitioner the full purchase price of his stock, there still remained about 110 million board feet of timber on the property in question. No purpose would be served by detailing here all the factors indicating a bona fide sale. See Anderson Dairy, Inc., supra, where some of the relevant factors considered by this Court in deciding an issue such as this are outlined. It will suffice here to say that the Trinity County transaction, viewed in its entirety, reveals that petitioner through the sale of his stock, parted irrevocably with his *211 interest in Trinity County. After such sale in 1952, petitioner possessed nothing more than the right to periodic payments and certain security rights exercisable only in the event of default by the Foundation. Respondent's arguments, for the main part, have been fully answered in Clay B. Brown, supra, and we see no reason to reconsider our views there stated. Respondent on brief also argues that petitioner held the properties here involved for sale to customers (presumably the Foundation) in the ordinary course of his trade or business and that, consequently, he is not entitled to capital gains treatment of the proceeds of his stock sales. Section 117(a), Internal Revenue Code of 1939, and section 1221, Internal Revenue Code of 1954. There is no merit in this argument, and it will be unnecessary to examine at length all of the relevant factors used by this and other courts in deciding such issues. We think it will be enough to state that two transactions of this kind in 1947 and one in 1952 do not place petitioner in the trade or business of selling property to foundations. Respondent also makes a belated argument on brief that the petitioner *212 has not shown that any of the stock sold by him was held for the requisite six-month period and that, therefore, petitioner is not entitled to capital gains treatment of the gains realized. There is no indication, prior to its appearance on brief, that the respondent considered this to be an issue. This Court has held repeatedly that issues raised for the first time on brief will not be considered. Eleanor C. Shomaker, 38 T.C. 192. In any event, we are satisfied from the evidence in the record that the petitioner's holding period of his Lakeview, Clark of Washington and Trinity County stock was, in each instance, longer than six months and hence the proceeds from the sale of the stock qualify for capital gains treatment. We hold that the sales by petitioner to the Foundation of his Lakeview, Clark of Washington and Trinity County stock were valid sales and that the gains realized by him from such sales are taxable as long-term capital gains. The next issue is whether petitioner is entitled to a non-business bad debt deduction of $40,645.16 in 1954. To be entitled to this deduction petitioner must establish that the advance of $40,645.16 made by him in 1951 to Clark *213 of Illinois became worthless in 1954. Section 166, Internal Revenue Code of 1954. Assuming that the advance was a debt and not a contribution to capital, we do not believe that petitioner has done so. Petitioner tells us merely that the corporation has a net loss of $36,666.19 from its operations in 1954, a net loss of $16,917.89 in 1955 and that it was dissolved in 1956. Petitioner's contention that the corporation ceased operations in 1954 is unsupported by the record. Certainly the evidence of operating losses in two successive years, without anything more, does not establish the worthlessness of the advance in the year selected by petitioner. See Trinco Industries, Inc., 22 T.C. 959, 965. Moreover it appears that petitioner was paid $12,218.33 by the corporation in 1955 on account of the 1951 advance. We hold, on the basis of the record, that petitioner has failed to meet his burden of proof on this issue. Decisions will be entered under Rule 50. Footnotes
*. Held in trust for Joyce V. Foreman.↩