Isis Windows, Inc. (formerly Metal Window Corporation) v. Commissioner. Leavitt B. Glaze and Edith L. Glaze v. Commissioner.
Isis Windows, Inc. v. Commissioner
Docket Nos. 79289, 79290.
United States Tax Court
T.C. Memo 1963-176; 1963 Tax Ct. Memo LEXIS 162; 22 T.C.M. (CCH) 837; T.C.M. (RIA) 63176; June 27, 1963
*162 A transferred a business in corporate form to B, a charitable foundation. B liquidated the corporation and leased the bulk of the assets to C, a corporation formed to operate the business, in which A held a large minority interest. C was to pay 80 percent of its profits as rent to B, who was then to pass on 90 percent of those receipts to A until the original purchase price was paid in full. Held: (1) the transfer from A to B in this case constituted a bona fide sale of a capital asset. (2) C's rental payments were made for the use of the leased property and are deductible as ordinary and necessary business expenses. John E. Scheifly and Irving M. Grant for the petitioners. *163 Earl C. Crouter for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioners' income and excess profits taxes for the years and in the amounts as follows: Year [1]
Tax
Deficiencies
Isis Windows, Inc., Docket No. 79289
1953
Income and
$37,322.56
Excess Profits
1954
Income and
89,010.53
Excess Profits
1955
Income
63,552.29
1956
Income
44,970.74
Leavitt B. Glaze and Edith L. Glaze, Docket No. 79290
1952
Income
5,947.62
1953
Income
21,365.76
1954
Income
79,875.17
The only issue presented as to the individual petitioners is whether their gain from the sale of certain real property and their stock in a company manufacturing metal windows should be taxed as capital gain or as ordinary income. The only issue presented as to the corporate petitioner is whether the amounts it paid in the form of rent to University Hill Foundation are deductible as rental expense. Findings of Fact Some of the facts are stipulated *164 and are hereby found as stipulated. Petitioners Leavitt B. Glaze (hereinafter sometimes referred to as "Glaze") and Edith L. Glaze (hereinafter sometimes referred to as "Edith"), husband and wife, reside in Los Angeles, California. They filed their joint Federal income tax returns for the years 1952 through 1954 with the district director of interal revenue at Los Angeles, California. Petitioner Isis Windows, Inc. (hereinafter sometimes referred to as "Isis"), was incorporated in California on June 11, 1952. About July 9, 1952, Isis changed its name to Metal Window Corporation and thereafter engaged in business under that name. [2] During the years here at issue, its principal place of business was Inglewood, California. It filed its accrual basis Federal income tax returns for its fiscal years ended March 31, 1953 through 1956, with the district director of internal revenue at Los Angeles, California. About October 1, 1945, Glaze purchased all the outstanding common stock of Steel Window Corporation (hereinafter *165 sometimes referred to as "Steel") from Gerald D. Heivly (hereinafter sometimes referred to as "Heivly") for $22,766.40. At that time Steel conducted its business on property it leased from Heivly on a month-to-month tenancy at $100 per month. As of March 1, 1947, Heivly increased the rent to $225 per month. About May 4, 1948, Glaze and Edith purchased for $6,400 real property at 501 South Isis Avenue in Inglewood, California. About April 24, 1950, Glaze and Edith completed the construction of a one-story building upon that property at a total cost of $19,048.89. The building encompassed approximately 7,720 square feet and was to be used as a factory. About May 1, 1950, they executed a five-year renewable lease of the property to Steel. The rentals payable under the terms of the lease, as amended on October 14, 1950, were: Monthly
Period
Rental
May 1, 1950 through November 30, 1950 $400
December 1, 1950 through April 30, 1951
475
May 1, 1951 through April 30, 1952
530
May 1, 1952 through April 30, 1953
585
May 1, 1953 through April 30, 1954
640
May 1, 1954 through April 30, 1955
700
Immediately after the execution of this lease, Steel moved its place *166 of business from Heivly's property to the Isis Avenue property. On or about October 10, 1950, Steel erected an additional building on the same property, contiguous to the existing building, for use as a warehouse, at a total cost of $4,090. On or about March 1, 1951, Glaze and Edith purchased for $10,016.70 land on which a residential bungalow was located at 507-509 South Isis Avenue, Inglewood, California, contiguous to the property which they had previously leased to Steel. Steel's business was fabricating and selling metal windows. Glaze caused Steel to start manufacturing its product from aluminum rather than steel. Reflecting this change, Steel's name was legally changed on April 29, 1948, from Steel Window Corporation to Metal Window Corporation. Thereafter it engaged in business under the latter name. When the Korean War started, the government agency controlling the use of materials under the Controlled Materials Plan notified businesses such as Steel that use of aluminum in that type of business would not be permitted. These restrictions were subsequently relaxed so that Steel was allocated a small amount of aluminum proportional to its previous use. Steel was not able *167 to satisfy its old, established customers' demands with the amount of aluminum allotted to it. In order to satisfy its commitments to its customers, Steel purchased windows from competitors. By early 1952, this situation had eased somewhat, but Steel was still unable to get enough aluminum to operate in a manner which Glaze considered satisfactory. Although Glaze had not advertised his business for sale, early in 1952 he was contacted by William Norton (hereinafter sometimes referred to as "Norton") and Harry Haake (hereinafter sometimes referred to as "Haake") regarding a possible sale to Ceco Steel Products Company, hereinafter sometimes referred to as "Ceco." Norton was then a district manager for Ceco. Haake was then Norton's immediate superior and vice president in charge of Ceco's Pacific coast operations. Ceco manufactured steel sash in the east. It was on the verge of entering the manufacture of aluminum window sash and had determined to do this on the west coast. Steel, a competitor of Ceco's, had equipment which was adaptable to the manufacture of both steel and aluminum sash and Ceco believed that its facilities would be adequate for their local operation. Ceco contemplated *168 acquiring Steel's machinery and equipment and moving it to Ceco's own location. Norton knew something about the manufacture of sashes, had been through Steel's plant, and had inventoried Steel's equipment to see if it would work properly with Ceco's. Norton verified to Haake, for Haake's use in his meeting with Glaze, that the equipment was something which Ceco could use and its approximate value. Norton valued the dies, presses, welders, buffers, drills, and tapping equipment at $50,000. This valuation did not include buildings, leasehold improvements, automotive equipment, deferred charges, cash, or current assets. Glaze and Haake had several meetings during March and April of 1952. Glaze furnished Haake with Steel's financial statements encompassing a balance sheet and profit and loss statement for the period February 1, 1951 to January 31, 1952. During his meetings with Haake, Glaze believed that Ceco wanted to buy all of Steel's assets. When Haake offered $160,000, but excluded delivery equipment, office furniture and fixtures, and all real property, Glaze concluded that Ceco merely wanted an assembly line. He turned down the offer and had no further negotiations with Ceco. *169 University Hill Foundation, formerly Loyola Foundation (hereinafter sometimes referred to as "Foundation"), was organized on April 26, 1945. Foundation's exemption certificate, granted on November 19, 1946, was revoked on April 4, 1956, retroactive to its fiscal year ended April 30, 1952. The issue of Foundation's tax exempt status is now pending before this Court. Shortly after Glaze turned down Ceco's offer, he informed Joe Schneider (hereinafter sometimes referred to as "Schneider"), Steel's auditor, of the negotiations. Schneider told Glaze that Foundation was interested in purchasing businesses. Glaze told Schneider that he would be favorable to negotiations or an offer and authorized Schneider to give Malone, Foundation's representative, financial information about Steel. An appointment was arranged for Malone to come to Glaze's office; and in April 1952, Malone, Schneider and Glaze met. Glaze had not previously met Malone. Glaze is not a Catholic, had not attended Loyola University or any of its branches, and had had no connection with Foundation prior to this transaction. Malone and Glaze had several meetings prior to June 16, 1952. At one of these, on the first occasion *170 when Malone asked Glaze what price he would consider for the business, Glaze quoted a price of $300,000 for all of Steel's assets, plus the real property owned by himself and Edith. Malone replied that he thought it a little high, but that he would consider it and come back for another meeting. At a later meeting, Glaze and Malone agreed upon a total price of $275,000 for the stock of Steel and the real property. On June 16, 1952, an agreement was executed providing for the sale of all the outstanding shares of Steel for $235,000, and the real property at 501 and 507-509 South Isis Avenue, Inglewood, California, subject to encumbrances, for $40,000, making a total of $275,000. $10,000 cash was to be transferred concurrently to Glaze and Edith, to be applied on the purchase price. The balance of $265,000 was to be paid only out of the sale of assets of Steel or out of amounts paid to Foundation by a new corporation formed to operate the business. Foundation agreed to liquidate Steel forthwith and lease Steel's name, goodwill, processes, formulae, real property, and fixed assets to the new corporation. Foundation agreed to sell to the new corporation all of the current assets and *171 deferred charges. The new corporation was to agree in writing to pay all obligations shown on Steel's closing audit and to give Foundation a two-year, noninterest-bearing note for the difference between the book value of the assets sold to the new corporation and the obligations assumed by it in this transaction. The lease was to be executed concurrently and to become effective upon dissolution of Steel. Although the purchase agreement was silent on this point, it was understood that the payments under the lease would be 80 percent of the new corporation's net earnings before tax. Foundation agreed to pay to the individual petitioners, to apply on the purchase price, 90 percent of all amounts received in cash under the lease until the purchase price was paid in full. The entire balance of the purchase price would become due and payable on July 1, 1962, if not paid sooner. The unpaid balance of the purchase price was to bear no interest except after maturity, and then only at the annual rate of four percent. If Foundation failed to cure a default, the individual petitioners could enforce payment, but only out of their collateral, i.e., security interests (deeds of trust, mortgages) *172 in the property acquired as a result of this transaction. Attached to the purchase agreement was a balance sheet of Steel as of June 15, 1952, as follows: ASSETS
Current Assets: Cash on Hand and in Bank
$ 96,753.83
Accounts Receivable - Trade
16,347.62
Accounts Receivable - Other
50.00
Inventory
19,836.41
Total Current Assets
$132,987.86
Reserve for
Net Book
Fixed Assets:
Cost
Depreciation
Value
Delivery Equipment
$11,202.10
$ 3,605.79
$ 7,596.31
Dies
2,986.54
1,374.20
1,612.34
Machinery and Equipment
28,337.21
15,045.47
13,291.74
Office Furniture and Fixtures
3,063.24
1,190.84
1,872.40
Total Fixed Assets
24,372.79
Deferred Charges: Deposits
$ 729.92
Prepaid Taxes
36.43
Prepaid Insurance
1,392.41
Total Deferred Charges
2,158.76
Total Assets
$159,519.41
LIABILITIES AND NET WORTH
Current Liabilities: Accounts Payable
$ 2,326.84
Withholding Taxes Payable
418.89
Payroll Taxes Payable
700.80
Sales Tax Payable
205.66
Commissions Payable
1,133.72
Officer's Salary Payable
1,415.03
State and Federal Income Taxes Payable
12,373.04
Total Current Liabilities
$ 18,573.98
Net Worth: Capital Stock
$ 3,000.00
Capital Surplus
1,175.27
Earned Surplus February 1, 1952
$131,527.29
Net Profit for Period
5,242.87
136,770.16
Total Net Worth
$140,945.43
Total Liabilities and Net Worth
$159,519.41
*173 On June 16, 1952, Foundation liquidated Steel, taking its assets, and giving to Glaze and Edith Foundation's check for $10,000, trust deeds on the Isis Avenue properties, and a chattel mortgage on the other property, which trust deeds and mortgage were officially recorded on June 17 and June 23, 1952, respectively. As further security for the unpaid balance of the purchase price, Foundation assigned to Glaze and Edith its lease to Isis (the new corporation formed to operate the business) and Isis' note for Steel's net current assets. On June 16, 1952, Isis and Foundation entered into a five-year lease under the terms of which Isis received the right to use the real property at 501 South Isis, the fixed assets which Foundation had received upon the liquidation of Steel, and the name and good will of Metal Window Corporation. The lease provided that after Isis paid a total sum of $310,000 in rental, the rate would be reduced from 80 percent to 60 percent of the net profits before taxes. Isis was obligated to maintain the premises in a good state of repair and could make capital improvements with the cost to be credited upon rental, to a maximum of $1,000 in any quarter year unless *174 Foundation consented in writing to a greater amount. Isis was to pay all property taxes and to fully insure the property. In the event of damage, the proceeds of insurance policies were to be used to restore the premises. Isis could not assign the lease or sublet the property without Foundation's written consent. At all times during the continuance of the lease at least 60 percent of the outstanding stock of Isis must be held only by such persons as Foundation approved. On November 24, 1954, the lease was amended to reduce the rental to 60 percent of net profits as of October 1, 1954, and to include 507-509 South Isis as a part of the demised premises commencing December 16, 1954. On June 16, 1952, Foundation transferred to Isis $125,146.62 of Steel's current assets. In return, Isis assumed Steel's current liabilities ($18,573.98) and gave Foundation its (Isis') promissory note for $106,572.64, payable on or before two years from date without interest before maturity but with interest at 7 percent and from and after maturity only. On June 9, 1953, the maturity date of the note was extended to June 16, 1957. The note was reduced by payments to a balance of $66,572.64 as of March 31, 1956, and *175 to a balance of $56,572.64 by the end of the lease period, June 16, 1957. On November 7, 1952, Isis issued 5,000 shares of stock at par ( $1), of which 2,100 shares were owned by Glaze and Edith and 100 shares each were owned by two sons and a son-in-law of theirs. Of the remaining 2,600 shares, 1,900 were owned by some of those "key" and long-time employees of Steel to whom Glaze offered stock in Isis. The remaining 700 shares were owned by persons designated by Malone. In February 1954, the stock in Isis was released from escrow pursuant to the order of the California Corporations Commissioner. During the term of this lease, Isis paid to Foundation a total of $522,327.52 as rent. This amount includes expenditures for the acquisition of new assets subject to the lease, credited against rents in the following net amounts in each of Isis' indicated taxable years: 1953
$ 4,376.73
1954
24,101.41
1955
4,980.63
1956
43,342.66
1957
45,514.16
Period ending 6-15-57
3,314.39
Total
$125,629.98
Foundation paid Glaze and Edith the following amounts on the purchase price: Calendar
Down
From
From Sale
Year
Payment
Rentals
of Assets
Totals
1952
$10,000
$ 26,873.07
$ 190.00
$ 37,063.07
1953
0
64,786.20
873.21 [3]
65,659.41
1954
0
121,495.38
50,782.14
172,277.52
$10,000
$213,154.65
$51,845.35
$275,000.00
*176 On November 24, 1954, the entire purchase price for the Steel stock and other property having been paid by Foundation, Glaze and Edith assigned Isis' note back to Foundation and released to Foundation its other security interests arising out of the June 16, 1952, transfer. On June 15, 1952, the adjusted basis to Glaze and Edith of the assets which they sold to Foundation was: Stock in Isis
$22,766.40
501 South Isis Avenue
Land
6,400.00
Buildings
17,427.98
507-509 South Isis Avenue
Land
1,839.08
Buildings
7,596.45
Total Basis
$56,029.91
Indebtedness on the real property totaled $9,846.96. In their returns for the years before us, Glaze and Edith reported their receipts from Foundation on the installment basis and treated their gain as long-term capital gain. In the notice of deficiency respondent treated the gain in each year as ordinary income. Steel's gross sales and net profits after taxes for the years subsequent to Glaze's and *177 Edith's acquisition of its stock were: Taxable
Gross
Net Profit
Year Ending
Sales
After Taxes
1-31-47
$129,815.71
$23,856.43
1-31-48
131,416.71
5,583.88
1-31-49
219,375.00
30,346.38
1-31-50
193,731.07
3,821.37
1-31-51
376,571.59
33,600.79
1-31-52
291,069.33
22,220.11
Pd 2-1-52 to 6-15-52
99,281.56
5,242.87
Isis reported the following on its Federal income tax returns for its taxable years 1953 through 1956: Deduction
Gross
for
Taxable
Income
Net After
Year
Sales
Rental
Income
Tax
Income Tax
1953 (9 1/2 mos.)
$354,634.85
$ 58,369.30
$14,008.64
$ 4,202.59
$ 9,806.05
1954
670,342.29
143,913.45
33,340.37
13,504.01
19,836.36
1955
874,065.89
132,890.19
55,907.57
23,571.94
32,335.63
1956
855,523.70
99,634.48
61,797.79
26,634.85
35,162.94
Respondent disallowed the claimed rental deductions (1953 fully; 1954 - $138,918.22; 1955 - $130,770.19; 1956 - $96,134.48) "due to lack of substantiation that the claimed expense constitutes a proper deduction under the provisions of Internal Revenue Code of [1939 for the taxable years 1953 and 1954; 1954 for the taxable years 1955 and 1956]. *178 " In lieu thereof, he determined to allow amounts "for the use of property" as follows: 1953
$5,199.15
1954
7,505.95
1955
8,554.24
1956
9,652.29
Isis' lease from Foundation expired June 15, 1957. Glaze had understood from Malone and Paul Cote, Foundation's attorneys, that Foundation would not renew Isis' lease. Accordingly, Glaze negotiated with Foundation for a lease on behalf of another corporation, Tie-Crete Metal Products Corporation, hereinafter sometimes referred to as "Tie-Crete." Tie-Crete had been incorporated in California on June 5, 1951. Its outstanding capital stock was owned in entirety by Glaze and Edith until December 30, 1959, after which minority interests were held by one or two of their sons. Tie-Crete had been formed for the purpose of manufacturing steel foundation ties which Glaze considered complementary to Steel's business, but Tie-Crete was unsuccessful. On or about June 4, 1957, and in anticipation of the new lease with Foundation, Tie-Crete executed agreements to purchase the stock of holders of 93 percent of Isis' stock. Tie-Crete executed a similar purchase agreement with a holder of an additional three percent on April 15, 1958. The *179 agreements provided for sale of stock to Tie-Crete for book value, five percent of the purchase price to be paid on or before September 1, 1957 (May 1, 1958, in the case of the 1958 agreement) and the remainder in ten equal yearly installments after settlement of income tax liabilities for the period prior to June 15, 1957. The price was to be reduced by the amount of any such liabilities. On June 15, 1957, when its lease with Foundation expired, Isis had a book net worth (exclusive of the proposed $234,856.12 tax deficiency here at issue) of $132,010.35, equalling $26.40 + per share. On June 16, 1957, Foundation and Tie-Crete executed a twenty-five year lease under the terms of which Tie-Crete received the right to use the assets owned by Foundation formerly used by Isis, including the name "Metal Window Corporation" and the goodwill attaching thereto. In return, Tie-Crete agreed to pay as rent 60 percent of its net profits before taxes. The lease between Tie-Crete and Foundation was almost identical to that between Isis and Foundation, except that: (1) Tie-Crete was obligated to pay a minimum rental of $24,000 per year, whereas no minimum rental was payable by Isis; (2) Tie-Crete's *180 rental was 60 percent of net profits throughout the term, whereas Isis' rental commenced at 80 percent and reduced to 60 percent after a total of $310,000 in rental had been paid; and (3) the lease between Tie-Crete and Foundation was for a term of twenty-five years, whereas the lease between Isis and Foundation was for a term of five years. About June 16, 1957, Tie-Crete changed its name to Metal Window Corporation. Thereafter, through the date of the trial, Tie-Crete engaged in the manufacture and sale of aluminum window frames at 501 South Isis Avenue, Inglewood, California, under the name Metal Window Corporation and under the terms of its lease with Foundation. No dividends were declared or paid by Steel during the period in which its stock was held by Glaze and Edith. Isis paid annual dividends of ten cents per share during its fiscal years ended March 31, 1954 through 1958. The assets transferred by Glaze and Edith to Foundation had a total fair market value in excess of $212,000. The June 16, 1952, purchase agreement effectively transferred ownership of Steel and the two parcels of real property from Glaze and Edith to Foundation. The amounts paid by Isis to Foundation *181 as rent pursuant to the terms of the June 16, 1952, lease were required to be paid as a condition to Isis' continued use and possession, for purposes of its business, of the property subject to the lease. Those amounts were not in excess of a fair rental as determined on a percentage basis for a five-year term commencing on the effective date of the lease. Opinion Issue 1 - Capital Gain Glaze and Edith maintain that the payments from Foundation during the years before us were received on account of the sale by them of capital assets held more than six months. They treat the gain as long-term capital gain, taxable on the installment method in the year received. Respondent's position is that there really was no sale within the contemplation of the Code, that the amount reported as gain is really current business profits and not sales proceeds. We agree with Glaze and Edith. The price paid for the assets transferred to Foundation "was within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of the corporate assets" [4] ( Clay B. Brown, 37 T.C. 461, 486 (1961), on appeal C.A. 9, 1962); the payments on the purchase price *182 were in fact completed within 2 1/2 years and the property was thereafter held by Foundation, subject only to the leases it negotiated and not subject to any security interest in the sellers; the direct testimonial evidence of intent to really transfer the ownership of the business by the 1952 sale is persuasive; and the form of the transaction clearly was that of a sale. *183 The Court of Claims' analysis of a similar transaction in Union Bank v. United States, Ct. Cl. , 285 F. 2d 126, 128 (1961), is particularly apt in the circumstances of this case: From the standpoint of the Goldenbergs, they were, before the 1951 transaction, the owners of valuable properties and a valuable going business. * * * After the 1951 transaction the Goldenbergs had no interest in these assets except a security interest, the power to take them back in case of default in payment for them. If they increased in value because of general prosperity or business success, or in dollar value because of inflation, the Goldenbergs would get no part of that important incident of ownership. If the Foundation had defaulted and the Goldenbergs had got their property back, and had again operated it and made profits from it, they would of course have had to pay ordinary income tax on those profits. They did not and will not get the property back, and when the final payment is made by the Foundation in 1961, even their security interest in the property will be gone, and they will have no relation whatever to it. We think it is logically and legally impossible for an owner *184 to part with his property, for a consideration, without selling it. The consideration which he gets for parting with his property is not income from the property, but is the price of his parting with the property. Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958), upon which respondent relies, is distinguishable on its facts in the same manner as it was found to be distinguishable in Clay B. Brown, supra, and Royal Farms Dairy Co., 40 T.C. - (April 29, 1963). See Union Bank v. United States, supra; Anderson Dairy, Inc., 39 T.C. - (March 26, 1963). We hold for the individual petitioners on this issue. Issue 2 - Rent Respondent maintains that the amounts deducted by Isis as rental [5] payments "were excessive and unreasonable, and but a camouflage of the earnings and profits. They did not constitute true rent." *185 Petitioner Isis argues that title to the property was in Foundation and not in it; that it held no equity in the property; that reasonableness of the amount of rental is irrelevant where the payor and the payee of the rental are not the same economic person; and that respondent's contention that the rentals are unreasonable is erroneous since it ignores (1) the risk involved to the lessor in a percentage lease and (2) the additional assets added by Foundation to the leasehold during the term of the lease. We agree with Isis. We have determined in our decision on the first issue that Foundation purchased Steel (and then secured its assets through liquidation) in reality as well as in form. In light of this determination, we conclude that petitioners have met their burden of coming forward with the evidence on the rent issue by presenting the stipulated terms of the lease which requires the payments of the amounts here at issue. See Sprague Electric Co., 36 T.C. 1043, 1083 (1961), on appeal C.A. 1, February 21, 1963; Leon Papineau, 28 T.C. 54, 57 (1957). We do not have the evidence in this case that enabled us to conclude in Royal Farms Dairy Co., supra, *186 that despite the lease's language, the payments were not required to be made as a condition to the continued use and occupancy of the property. The record before us in this regard is much more like that in Anderson Dairy, Inc., supra, and we reach the same result here as was reached in that case. Respondent's brief treatment of this issue stresses the concept that the rent was unreasonable. Respondent offers no explanation for the amounts that were proposed to be allowed in the deficiency notice in place of the disallowed rental payments. Nor does respondent suggest what effect the testimony of his expert witness should have on the presumption of the correctness of respondent's determination. [6]
At this stage of our inquiry, reasonableness is relevant only to assist us in determining if the amounts paid were for rent [7] rather than something else. Royal Farms Dairy Co., supra; Anderson Dairy, Inc., supra; Stanley Imerman, 7 T.C. 1030, 1037 (1946). *187 Respondent's expert witness testified that, on the basis of Steel's five-year average "annual net income as adjusted" of $39,529, a fair annual rental for the property leased would be $20,000. We confess to being more confused than enlightened by that expert's explanation of how the $20,000 figure was derived. In any event, no consideration appears to have been given to the fact that the lease contemplated additional investments by Foundation in property that would be subject to the lease. In fact, $125,629.98 was so invested out of the amounts paid as rent during the term of the initial lease. We do not dispute the statement of respondent's expert that."A fair rental is an amount which will provide a fair return on the capital investment and which will allow recovery of the capital investment loss through depreciation." See Royal Farms Dairy Co., supra, at - (mimeo. p. 35). When we consider this additional investment, together with the fluctuating earnings record of Steel for the five years preceding the execution of the lease, a percentage rental at the levels here involved (80 percent until $310,000 had been paid and 60 percent thereafter) does not appear to be unreasonable. If *188 anything, this strengthens our conclusion that the amounts paid pursuant to the lease for the years before us were required to be paid for the use of business property and are deductible as rent. See Jos. N. Neel Co., 22 T.C. 1083, 1090 (1954). Cf. Royal Farms Dairy Co., supra. On this issue we hold for the corporate petitioner. Decisions will be entered for the petitioners. Footnotes
1. Corporate petitioner - fiscal years ended March 31 of the indicated years; individual petitioners - calendar years.↩
2. So stated at stipulation 31. Stipulations 41 and 60 state that Isis engaged in business under the name Metal Window Corporation "from June 16, 1952, to June 15, 1957."↩
3. The stipulated exhibit indicates the 'payments during 1953 on account of sales of assets to have been $25 and $858.21. Other statements in that exhibit indicate that the latter figure must have been $848.21.↩
4. Respondent's expert witnesses' testimony regarding certain of the assets, together with the apparently undisputed book value of other assets results in a total valuation of $212,095.68. It is not clear whether this includes the real property at 507-509 South Isis Avenue. Haake's offer of $160,000 excluded assets among which were those which respondent's expert testified had a net fair market of $49,273.04. Norton valued at $50,000 the dies and machinery to which respondent's expert assigned a total value of $29,250. Since a fair price for a going business is greater when the price is to be paid solely out of the earnings of the business than it would be if the sale were for cash, it is clear that the fair market value of the assets in a sale on the terms present here would exceed $212,000. See M. Pauline Casey, 38 T.C. 357, 382↩ (1962); Royal Farms Dairy Co., 40 T.C. - (April 29, 1963).
5. SEC. 162. [IRC 1954] TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. Almost identical language appeared in section 23(n)(1)(A) of the 1939 Code.↩
6. Respondent's expert witness testified to a fair annual rental that was more than twice as much as the amounts respondent proposed to allow as a deduction.↩
7. Cf. sections 162(a)(1) of the 1954 Code and 23(a)(1)(A) of the 1939 Code which limit, in terms, deductions for compensation to "a reasonable allowance."↩