**UNIVERSITY HILL FOUNDATION,**
etc., Petitioner-Appellee,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellant.**

No. 24929.

United States Court of Appeals,
Ninth Circuit.

May 17, 1971.

Rehearing Denied Sept. 20, 1971.

Gilbert E. Andrews (argued), Atty. Tax Div., Johnnie M. Walter, Asst. Atty. Gen., Washington, D. C., for respondent-appellant.

Austin Peck (argued), Dana Latham, Henry Steinman, and John Hall, Los Angeles, Cal., for petitioner-appellee.

Before BARNES and DUNIWAY, Circuit Judges, and SCHNACKE, District Judge.*

* Honorable Robert H. Schnacke, United States District Judge, Northern District of California, sitting by designation.

DUNIWAY, Circuit Judge:

This case involves disputed income and excess-profits taxes in the aggregate amount of $10,070,677.25, for the period beginning with the fiscal year ended April 30, 1952, and ending with fiscal year ended April 30, 1965. The Commissioner of Internal Revenue appeals from a decision of the Tax Court finding the University Hill Foundation free from liability for the disputed taxes. We reverse.

The Tax Court's opinion contains comprehensive findings of fact, University Hill Foundation, 1969, 51 T.C. 548, 549–559, and we do not restate them here. There is no dispute as to the facts, and this opinion will assume familiarity with the findings and opinion of the Tax Court, to which reference will be made from time to time.

The Commissioner, on June 15, 1945, ruled on a temporary basis that the Foundation was tax exempt under Section 101(6) of the Internal Revenue Code of 1939. That subsection exempted from taxation

"(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda or otherwise attempting, to influence legislation."

The ruling was made final on November 19, 1946.

The Revenue Act of 1950 amended Section 101:

"(b) Feeder organizations.—Section 101 is hereby amended by adding at the end thereof the following paragraph:

'An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under any paragraph of this section on the ground that all of its profits are payable to one or more organizations exempt under this section from taxation. For the purposes of this paragraph the term "trade or business" shall not include the rental by an organization of its real property (including personal property leased with the real property).'" (Revenue Act of 1950, Title III, § 301(b), 64 Stat. 906, 953.)

We refer to this amendment as the feeder organization amendment. Under Section 303 of the Revenue Act of 1950, the amendment applies only to fiscal years beginning after December 31, 1950.

When the Internal Revenue Code of 1954 was adopted, Section 101(6) became section 501(c) (3), and the feeder organization amendment became section 502, but without material change in either provision.

On April 4, 1956, the Commissioner revoked the exemption ruling. The only ground for the revocation now pertinent is that the Foundation was not "organized and operated exclusively for" exempt purposes under section 101(6) or 501(c) (3). The revocation ruling was made effective beginning with the fiscal year ended April 30, 1952, i. e., the first fiscal year beginning after December 31, 1950. The question is whether this ruling is correct. We hold that it is.

1. *The charitable exemption.*

Sections 101(6) (1939) and 501(c) (3) (1954) require that, to qualify for the exemption, an organization such as the Foundation must be both *organized* exclusively for and *operated* exclusively for religious, charitable, or educational purposes. Commissioner of Internal Revenue v. John Danz Charitable Trust, 9 Cir., 1960, 284 F.2d 726, 730, citing Universal Oil Products Co. v. Campbell, 7 Cir., 1950, 181 F.2d 451, cert. den. 1950, 340 U.S. 850, 71 S.Ct. 78, 95 L.Ed. 623. The Tax Court properly determined that the organization requirement was satisfied in this case. 51 T.C. at 566. The only question under sections 101(6) and 501(c) (3), therefore, is

whether the Foundation was *operated* exclusively for exempt purposes.

Organizations directly engaged in concededly religious, charitable, or educational activities are of course tax exempt; thus, in this case Loyola University, the beneficiary of the Foundation's activities, is tax exempt. The Foundation, however, is directly engaged not in educational activities, but rather in commercial ventures, the profits from which are paid over to Loyola University. The immediate question is whether that activity allows us to characterize the Foundation as operated exclusively for exempt purposes. The question is one of first impression in this court.[1]

a. *Section 101(6) before 1951.*

Before 1951, when the Revenue Act of 1950 took effect, the courts took two approaches in determining whether organizations such as the Foundation were tax exempt under section 101(6). The first approach applied the so-called "destination of income" test, according to which an organization was exempt under the section if all of its income was distributed exclusively for charitable purposes, even though the organization's primary or sole activity consisted of carrying on active business operations. Roche's Beach, Inc. v. Commissioner of Internal Revenue, 2 Cir., 1938, 96 F.2d 776; C. F. Mueller Co. v. Commissioner of Internal Revenue, 3 Cir., 1951, 190 F.2d 120; Willingham v. Home Oil Mill, 5 Cir., 1950, 181 F.2d 9, 10; Lichter Foundation v. Welch, 6 Cir., 1957, 247 F.2d 431, 436; Boman v. Commissioner of Internal Revenue, 8 Cir., 1957, 240 F.2d 767, 770–771; Sico Co. v. United States, 1952, 121 Ct.Cl. 373, 102 F.Supp. 197.[2] The rationale underlying this test is that "the benefit from revenue is outweighed by the benefit to the general public welfare gained through the encouragement of charity." C. F. Mueller Co. v. Commissioner of Internal Revenue, *supra*, 190 F.2d at 122. The Tax Court applied the destination-of-income test in the instant case, concluding that under pre-1951 law the Foundation would be entitled to a section 101(6) exemption. 51 T.C. at 562, 567.

1. This question has been adverted to, but not decided, in Commissioner of Internal Revenue v. Brown, 1965, 380 U.S. 563, 580, 85 S.Ct. 1162, 14 L.Ed.2d 75 (Harlan, J., concurring) affirming 9 Cir., 1963, 325 F.2d 313. In *Brown*, the Supreme Court upheld the seller's capital-gains treatment of the deferred purchase-money installments in a Cote transaction. The latter issue, capital-gains treatment, has been frequently considered by the Tax Court in proceedings against sellers of businesses to the Foundation. See Anderson Dairy, Inc., 39 T.C. 1027 (1963); Royal Farms Dairy Co., 40 T.C. 172 (1963); Ralph M. Singer, 22 T.C.M. 759, T.C.Memo 1963–158; Isis Windows, Inc., 22 T.C.M. 837, T.C.Memo 1963–176; Oscar C. Stahl, 22 T.C.M. 996, T.C.Memo 1963–201; Estate of Sol Goldenberg, 23 T.C.M. 810, T.C.Memo 1964–134. The Commissioner has also proceeded against the companies operating businesses purchased by the Foundation and leased to them, seeking to deny the rental-expense deduction. See Anderson Dairy, Inc., 39 T.C. 1027 (1963); Royal Farms Dairy Co., 40 T.C. 172 (1963); Warren Brekke, 40 T.C. 789 (1963); Isis Windows, Inc., 22 T.C.M. 837, T.C.Memo 1963–176;

Oscar C. Stahl, 22 T.C.M. 996, T.C.Memo 1963–201; Estate of Sol Goldenberg, 23 T.C.M. 810, T.C.Memo 1964–134.

2. Although the cases cited here, as well as most of those cited in the next paragraph, were decided after 1951, all involve taxable years preceding 1951. In passing the 1950 Revenue Act amendments to section 101, Congress stated that "[t]he amendments made by this part shall be applicable only with respect to taxable years beginning after December 31, 1950. The determination as to whether an organization is exempt under section 101 of the Internal Revenue Code from taxation for any taxable year beginning before January 1, 1951, shall be made as if [the amendments to section 101] had not been enacted and without inferences drawn from the fact that the amendment made by such section is not expressly made applicable with respect to taxable years beginning before January 1, 1951." Revenue Act of 1950, Tit. III, Part I, § 303, 64 Stat. 906, 954. Thus those post-1951 cases all involve the application of the pre-1951 version of section 101, and they are relevant here.

The second pre-1951 approach to section 101(6) focussed on the nature of the organization's activities and the source of the income, and expressly rejected the destination-of-income test as applied to organizations (like the Foundation) not directly engaged in exempt activity. This court has consistently adhered to this second, source-of-income approach. Ralph H. Eaton Foundation v. Commissioner of Internal Revenue, 9 Cir., 1955, 219 F.2d 527; John Danz Charitable Trust v. Commissioner of Internal Revenue, 9 Cir., 1955, 231 F.2d 673, 675–676; Riker v. Commissioner of Internal Revenue, 9 Cir., 1957, 244 F.2d 220, 230–235; Randall Foundation v. Riddell, 9 Cir., 1957, 244 F.2d 803, 806–808; cf. Commissioner of Internal Revenue v. John Danz Charitable Trust, 9 Cir., 1960, 284 F.2d 726, 732–733. The Fourth and Seventh Circuits have also taken this approach. United States v. Community Services, Inc., 4 Cir., 1951, 189 F.2d 421, 424–425; Universal Oil Products Co. v. Campbell, 7 Cir., 1950, 181 F.2d 451, 461. Underlying this approach is the judgment that section 101(6) was intended by Congress "to tax all business income, however destined, unless the company was really not in business at all." Roche's Beach, Inc. v. Commissioner of Internal Revenue, supra, 96 F.2d at 779 (L. Hand, dissenting). We illustrated the approach most clearly in Ralph H. Eaton Foundation, supra. The question in that case was whether a nonprofit corporation was entitled to exemption under section 101(6), where "the corporation itself was not intended to operate and did not operate as a religious, educational, or charitable institution" but merely "turned over to such institutions * * * the profits from its various business activities." 219 F.2d at 528. Rejecting the destination-of-income test, we cited the Fourth Circuit's opinion in the Community Services case, supra, and stated (id. at 529):

"The court, speaking through Judge Dobie, thought that the taxpayer involved was in effect organized and operated for two purposes: (1) to engage in commercial business for profit, and (2) to turn over the profits realized from those commercial activities to charitable organizations. It said that 'the second purpose is charitable; the first purpose clearly is not. To qualify for the exemption here, the corporation must be "organized and operated exclusively for * * * charitable * * * purposes."'

In the case before us it would appear that none of the activities in which petitioner actually engaged was charitable or religious. All were of a business or commercial nature. But assuming the function of turning over the profits was an activity or operation it certainly was not the principal one. We agree with the Fourth Circuit that the word 'exclusively' as used in the statute must be given effect." Cf. Better Business Bureau v. United States, 1945, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67.

We think it clear that, under our construction of the pre-1951 section 101(6) exemption, the University Hill Foundation was not "operated exclusively for religious, charitable, or * * * educational purposes." The businesses involved in the 21 Cote-formula transactions were a diverse lot, including inter alia a hotel, three sand, gravel and concrete companies, three dairies, a foundry, and eight manufacturing concerns making and selling a wide variety of products. It is arguable that the Foundation was engaged in the respective trade or business of each of the companies whose assets it had bought and then leased. We need not decide this question, however, and we may assume that the Tax Court was correct in finding that the form of the transactions successfully shielded the Foundation from any direct involvement in the operating companies' businesses. 51 T.C. at 568–569. For, in any case, the Foundation was beyond any doubt engaged in a business of its own—the acquiring of business corporations and the selling of some and leasing of others of their as-

sets to operating companies. The Foundation was, to coin a phrase, a used-business dealer. Its transactions "were not occasional or isolated ventures," Randall Foundation v. Riddell, *supra*, 244 F.2d at 807, and we do not intimate the result had that been the case. Here, the Foundation systematically participated, over a 9-year period, in 21 Cote transactions involving the purchase of 25 businesses and the sale of some and the lease of the rest of their assets. (See the table at 51 T.C. 556.) Here, as in the *Randall Foundation* case, the transactions "constituted almost the only activity of [the] Foundation during these years,[3] 244 F.2d at 807. Moreover, the Foundation was a very special type of used-business dealer. It could engage successfully in its business only if it was tax exempt; its business was the buying of businesses and leasing them by the use of its tax exemption. As the Tax Court points out in its opinion, page 560,

> "The economic effect of these devices was to divide the net profits of each business; 20 percent to the operators, 8 percent to petitioner, and 72 percent to the sellers, with the operators claiming a deduction for the rentals as business expenses, the sellers reporting their profit on the sale as capital gains, and the petitioner claiming exemptions from tax as a charitable organization on the amounts received by it."

The deals would have been financially impossible if the Foundation had to pay tax on the "rents" that it received. Thus the Foundation was in the business of using its claimed tax exemption to buy used businesses.

As a direct consequence of those transactions, the Foundation gave to Loyola University during the years in question a total of $1,984,044.20, and it has accumulated since 1956 an additional $4 million or more which it intends to distribute to Loyola if this dispute is resolved favorably to the Foundation. These benefactions were the proceeds of activities whose primary purpose was to turn a profit; profit was essential, else nothing could have been donated to Loyola. And unlike the corporation in Squire v. Students Book Corp., 9 Cir., 1951, 191 F.2d 1018, "the business enterprise in which [the Foundation] is engaged" does not bear "a close and intimate relationship to the functioning of the College itself." *Id.* at 1020.

Nor is it an answer to say that since 1954 the Foundation has stopped *buying* businesses. This was done in response to Revenue Ruling 54–420, 1954–2 Cum. Bull. 128, which denies exemption to Cote-type transactions. The Foundation continued thereafter to be in the business-*leasing* business and in the business-lease-*selling* business, as it was before, and that business was still a profit-making enterprise, bearing no relationship to the functioning of Loyola University.

We conclude, therefore, that throughout the years in question the Foundation was engaged in commercial business for profit. That was what it was operated for. Even though the profits were ultimately distributable to an exempt institution, the Foundation was not "operated exclusively for" exempt purposes. Under our pre-1951 approach to section 101(6) the Foundation is not entitled to an income tax exemption.

b. *Section 101(6) as amended in 1951.*

As we have seen, the Revenue Act of 1950 amended section 101 of the 1939 Code by adding to it the feeder organization paragraph that we have previously quoted. The purpose of the par-

---

3. The only activities that the Foundation undertook other than the Cote transactions were: the acquisition of motion-picture royalty rights; the purchase of an office building and land and the subsequent sale of the building; the purchase and subsequent sale of a second office building; and the purchase of several pieces of residential property, some of which were later sold. See 51 T.C. at 556–557.

agraph certainly was not to enlarge or broaden the section 101(6) exemption; quite the contrary. Several courts of appeals, including this court, have considered section 101(6) as thus amended in the light of its legislative history. Without exception, they concluded that in amending section 101 the Congress intended to require courts to adopt the source-of-income test previously followed by this circuit, rather than the destination-of-income test that had been followed in other circuits. People's Educational Camp Society, Inc. v. Commissioner of Internal Revenue, 2 Cir., 1964, 331 F.2d 923, 935; United States v. Community Services, Inc., 4 Cir., 1951, 189 F.2d 421, 426; Lichter Foundation v. Welch, 6 Cir., 1957, 247 F.2d 431, 437; Squire v. Students Book Corp., 9 Cir., 1951, 191 F.2d 1018, 1020; Ralph H. Eaton Foundation v. Commissioner of Internal Revenue, 9 Cir., 1955, 219 F.2d 527, 529 n. 1; Veterans Foundation v. United States, 10 Cir., 1960, 281 F.2d 912, 913–914; Sico Foundation v. United States, Ct.Cl., 1961, 295 F.2d 924, 927–928. Especially noteworthy is People's Educational Camp Society, *supra*, in which the Second Circuit explicitly recognized that Congress had, by amendment, "overrule[d]" the Second Circuit's holding in *Roche's Beach, supra,* which first enunciated the destination-of-income test. 331 F.2d at 935. There is no need to discuss the legislative history of the amendment in connection with this point; the cases cited above contain adequate discussions to that end. *Cf.* S. Rep. No. 2375, 81st Cong., 2d Sess., in 1950–2 Cum.Bull. 483, at 504–505, 509, 565–566; H.Rep. No. 2319, 81st Cong., 2d Sess., in 1950–2 Cum.Bull. 380, 409, 412, 469.

■ As a result of the feeder organization amendment, application of this circuit's pre-1951 approach to the facts of the case before us leads indisputably to the proper analysis and conclusion, since the taxable years here in dispute all post-date 1951: The University Hill Foundation has not been operated exclusively for exempt purposes, and is not, in the absence of other considerations, entitled to an income tax exemption for the taxable years 1952–1965.

### 2. The real property leasing proviso of the feeder organization amendment.

The primary purpose and effect of Congress' enacting the amendment was to exclude "feeder organizations" from the section 101(6) exemption. The amendment defines a feeder organization as "[a]n organization operated for the primary purpose of carrying on a trade or business for profit * * * all of [whose] profits are payable to one or more organizations exempt * * * from taxation." We have determined that the Foundation is such an organization. The Foundation argues, and the Tax Court found, that the Foundation is nonetheless exempt because it falls within the proviso to the amendment. The proviso states:

"For the purposes of this paragraph the term 'trade or business' shall not include the rental by an organization of its real property (including personal property leased with the real property)."

The Foundation's argument, accepted by the Tax Court and repeated before us, is that almost every one of the Cote transactions involved the lease of a business' assets some part of which consisted of real property, that a part of the rent paid by the operating company was therefore for that real property, and that the remainder of the assets leased constituted "personal property leased with real property." See 51 T.C. at 570–572. These views, we think, stand the feeder organization amendment on its head. They turn an amendment that was clearly intended to give effect to a narrow interpretation of section 101(6) into an amendment granting, as to the type of transaction here, an exemption broader than that which previously existed. We cannot belive that such was the intention of the proviso, and we decline to give it such a construction.

In so holding, however, we need not and do not accept the Commissioner's construction of the proviso. The Commissioner argues that the plain meaning of the proviso is that it applies only to leases consisting predominantly of real property and only incidently of personal property, and that the leases here are not of that kind. In addition the Commissioner invokes the legislative history of the feeder organization amendment, asserting that that history clearly reveals Congress' intent *not* to grant tax exemptions to organizations doing precisely what the Foundation has done here. We think the opposing constructions given by the parties to the language of the proviso lead to inconclusive results, for on its face, the proviso neither indicates nor even hints what relative proportions of real versus personal property are required to render a lease transaction exempt. Accordingly, the application of the proviso to the case before us cannot be properly determined without an inquiry into the legislative history of the feeder organization amendment.

The legislative history of the Revenue Act of 1950 shows that Congress did not intend any feeder organization to be automatically exempt from taxation merely because its income derived from rental of property some part of which was real property. Certainly Congress drew a distinction between the rental of real property and the rental of personal property. Over and above that distinction, however, Congress was concerned with the nature of the transactions through which a feeder organization leased its real property. Thus, the House Report on the Revenue Act of 1950 stated: [4]

"The tax applied to unrelated business income does not apply to * * * rents (other than certain rents on property acquired with borrowed funds), and gains from sales of leased property. Your committee believes that such 'passive' income

---

4. Some of the comments set out in the opinion were made in discussions of the provisions of the Revenue Act of 1950 dealing with unrelated business income, rather than with taxation of feeder organizations. It is evident, however, that the tax abuse with which Congress was concerned arises identically in both cases. For any exempt organization possesses the inherent competitive advantage of being able to trade on its exemption. The only reason for articulating separate remedial provisions dealing with feeder organizations on the one hand, and unrelated business income on the other, is the possibility of two types of charity-oriented exempt organizations. By definition a feeder organization does not participate directly in any exempt activity; if it is exempt, the exemption is earned derivatively, by virtue of the feeder organization's financial support for the exempt activities of a school, or church, or charity. Once it is determined that the primary purpose of the feeder organization is to make money as an independent enterprise rather than to funnel money, more or less passively, to the charity, no difficulty arises in divesting the feeder organization of its exemption. The remedy cannot be so direct if an uncontestably exempt organization, such as a university, is engaged in business enterprises on the

side to support its exempt activities. The exemption of a university cannot be as blithely removed as it can in the case of a feeder organization, for a university is by definition exempt. Thus the remedy is different: The tainted income is determined to be taxable though the university as a whole remains exempt.

Thus the need for dual remedial provisions arises because there are two generally distinguishable types of exempt organizations involved. An exempt organization of either type—a feeder organization or a university itself—can trade on its exemption by entering a Cote transaction. As the legislative history cited in the text of our opinion shows, Congress found such trading to be a misuse of the exemption. That misuse had to be remedied and the remedies would have to be different in the two cases. Much of the Congressional discussion was couched specifically in terms of the application of the unrelated business income provision as a remedy for the misuse of the tax exemption. But that discussion shows clearly that the misuse existed, that the Congress desired to eliminate it, and that there is no reason to distinguish the misuse in the case of a feeder organization from the misuse in the case of a university—except insofar as different remedial provisions apply.

should not be taxed where it is used for exempt purposes because investments producing incomes of these types have long been recognized as proper for educational and charitable organizations."

H.Rep. No. 2319, *supra*, in 1950–2 Cum. Bull. 409. During the House debate Representative Lynch, speaking on behalf of the revenue bill, stated:

"The receipt of interest, dividends, and royalties does not constitute carrying on of an active business. In general, the receipt of rent is also considered a proper activity for these organizations and is not taxed. Historically, the colleges and other exempt organizations have often invested their endowments in rental property —and the bill does not tax this.

" * * *

* * * * * *

" * * * However, it does tax a university which borrows on its exemption to buy property in an attempt to receive tax-free rents."

96 Cong.Rec. 9366–67 (1950) (emphasis added). In particular the 1950 amendments were aimed at the abusive practices of tax-exempt organizations engaged in purchase and lease-back arrangements with private businesses. In such arrangements,

"huge rental payments are taken out of the scope of the income tax in lease-back deals which are so favorable to the private businesses involved that no private investor could hope to offer the same terms. Since all the tax-exempt institution need supply in one of these transactions is its tax-exempt privileges, it is apparent that these are examples of tax-exempt organizations going into the business world and selling their tax exemption to the highest bidder. * * * The committee feels that the tax-avoidance racket involved in the sale or lease-back of the tax-exempt status of these institutions must stop."

*Id.* at 9366 (emphasis added). The House Report points out that these same considerations apply both in strict lease-back cases, "where the vendor and the lessee are the same person," and 'in cases, like the Cote transactions here, where they are not. H.Rep. No. 2319, *supra*, in 1950–2 Cum.Bull. 411.

Thus, in enacting the feeder organization amendment, Congress expressed its intention to plug a much-abused tax loophole by refusing exemptions to feeder organizations in the business of acquiring property, including real property, by trading on their exemption, and then leasing that property as part of the transaction by which they obtained it. The proviso of the feeder organization amendment is intended only to protect feeder organizations whose income derives from real-estate investments of the "passive" nature traditional among exempt institutions.

There is no question that the University Hill Foundation was in the business of trading on its tax exemption in precisely the way Congress disapproved. We have recognized this on a previous occasion. A transaction essentially similar to the Foundation's Cote transactions was involved in Commissioner of Internal Revenue v. Brown, 9 Cir., 1963, 325 F.2d 313, aff'd 1965, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75. There we stated that "[t]here is no question that this transaction took the form that it did because the Institute is a tax-exempt corporation and that the price to be paid was probably greater for that reason." *Id.* at 316. Justice Harlan, concurring in Commissioner of Internal Revenue v. Brown, stated even more bluntly that "[o]bviously the Institute traded on its tax exemption," and suggested that "one may ask why, if the Government does not like the tax consequences of such sales, the proper course is not to attack the exemption." 380 U. S. at 580, 85 S.Ct. at 1171. That is what the Commissioner is doing here. Numerous commentators also share the view that in transactions like these Cote transactions the exempt organization is trading on its exemption, thereby obtaining considerable financial benefit

for itself and for its partners in the transaction. See, *e. g.*, Note, Tax Problems of Bootstrap Sales to Exempt Foundations: A Comprehensive Approach, 18 Stan.L.Rev. 1148, 1150 (1966); Note, Bootstrap Acquisitions: The Next Battle, 51 Iowa L.Rev. 992–95 (1966); Lanning, Tax Erosion and the "Bootstrap Sale" of a Business—I, 108 U.Pa.L.Rev. 623, 637–38, 682–83 (1960). We conclude, therefore, that the Cote transactions undertaken by the University Hill Foundation do not fall within the proviso of the feeder organization amendment, now section 502 of the 1954 Code. Congress intended to deny tax exemption to organizations engaged in just such a business, and we must accordingly find the Foundation to be non-exempt.

In so holding, we neither approve nor disapprove the Commissioner's argument that the proviso refers only to the rental of property consisting predominantly of real property. Consequently, we need not and do not base our holding in any way on Congress' amendment of the proviso in the Tax Reform Act of 1969, Title I, §§ 121(b) (2) (A), 121(b) (7), 83 Stat. 487, 538–539, 542, which allows an exemption only if "the rents attributable to such personal property are an incidental amount of the total rents received or accrued under the lease." We intimate no opinion whether, in passing the Revenue Act of 1950, Congress had intended this "incidental" limitation to be understood in the proviso or whether Congress was, in 1969, merely clarifying existing law. We hold, rather, that in 1950 Congress clearly intended to halt certain abusive tax-avoidance practices which can be identified without reference to the ratio of real to personal property, and that such a practice is clearly involved in this case. We are not purporting to reverse the Tax Court merely because the arrangements here in question are "undesirable from a tax standpoint." Brown v. Commissioner of Internal Revenue, *supra*, 325 F.2d at 316. We repeat what we said there: "If * * * the present situation

* * * is undesirable from a tax standpoint, it is still possible for Congress to provide a remedy." We think that, insofar as tax exemption is concerned, Congress in 1950 did just that.

Reversed and remanded.

SCHNACKE, District Judge (concurring in part and dissenting in part):

I concur in so much of the opinion of the majority as holds that the Foundation is and was organized exclusively for religious, charitable, or educational purposes within the meaning of Sections 101(6) of the 1939 Code and 501(c) (3) of the 1954 Code. Indeed, the contrary, though urged by the Commissioner before the Tax Court, has not been pressed here.

I respectfully dissent, however, from so much of the opinion as holds that the income of the Foundation is rendered taxable by the feeder organization provisions added as Section 101(6) (b) by the Revenue Act of 1950 and the provisions of Section 502 of the 1954 Code, essentially for the reasons advanced in the majority opinion of the Tax Court, University Hill Foundation, 51 T.C. 548, 559–574.

The court decisions prior to the statutory provisions here involved are exhaustively reviewed by the Tax Court and, to some extent, by the majority opinion, and will be adverted to here only insofar as is necessary to show the basis of my disagreement with the majority of the Court.

As the Tax Court well said,

"In essence, we are called upon herein to chart a course on the sea of judicial interpretation which will avoid the reefs of judicial legislation." 51 T.C., at p. 561.

In my view, the majority in this case has run aground upon such a reef.

There can be no doubt that the taxpayer here ingeniously devised and skillfully executed a formula (the "Cote formula") for the purpose of bringing its operations in buying and selling businesses within the rental exclusion of

Section 101(6) of the 1939 Code (as amended by the Revenue Act of 1950) and Section 502 of the 1954 Code. This, however, is the beginning and not the end of our inquiry. We must decide whether or not it was successful in achieving its manifest purpose.

In approaching this problem it is well to bear in mind what this Court has said: " * * * the literal meaning of words can be insisted on in resistance to a taxing statute * * * ", United States v. Armature Exchange, 116 F.2d 969, 971 (9th Cir.), certiorari denied, 313 U.S. 573, 61 S.Ct. 960, 85 L.Ed. 1531. It can scarcely be denied that the Cote formula complies specifically with the letter of the rental provisions of the feeder organization exception.

The "legislative saga," as the Tax Court called it (51 T.C., at p. 565), of the rental provisions respecting feeder organizations is of little assistance (except in the one respect hereafter noted, which relates to the 1969 amendments, adopted after the decision of the Tax Court herein). It seems clear that Congress had intended to preserve the exempt status of income derived by charitable organizations from the leasing of hotels, apartments and office buildings, together with their incidental furnishings and fixtures, and to preserve exemption of income derived from essentially "passive" investments of charitable organizations. The majority directly rejects basing its decision on these concepts of incidental or passive income and Congress did not incorporate them into its amendment, except as they are distilled into the unambiguous language of the feeder amendment. The Congress said in plain words in Sections 502 and 512 that a corporation, even though organized and operated for trade or business at a profit remained exempt under Section 501 if its profits were all payable to an organization, exempt under that section and if all of its income was derived from the rental of its real property (including personal property leased with the real property).

The majority sees fit to state that the Foundation was "beyond any doubt engaged in a business of its own," colorfully dubbed that of "a used-business dealer" (ante, pp. 704–705). This, I respectfully submit, gets us nowhere, since all charitable organizations deriving profits (as all hope to) from their investments can. in a sense be said to be engaged in a business—the investment business, in which, it might be mentioned, they are in competition with numerous other corporations and private individuals, perhaps unfairly so in the view of some because of their tax advantage.

The question, rather, is whether the Foundation's business, whatever called, falls within the limits fixed by the statute, the "rental * * * of real property (including personal property leased with the real property.)." The majority has nowhere faced up to this question. If they did, they would have to agree, as the Tax Court found, that the taxpayers' activities fell squarely within the exemption.

It is entirely incorrect to say, as the majority does, that "The Tax Court applied the destination-of-income test in the instant case * * * " (ante, p. 703). The Tax Court expressly recognized that one of the main purposes of the 1950 amendments was to repeal the destination-of-income test. 51 T.C., at p. 564. Moreover that test, as applied by the numerous cases cited by the majority, beginning with Roche's Beach, Inc. v. Commissioner of Internal Revenue, 96 F.2d 776 (2nd Cir.) dealt with the organization requirements (as to which the majority here agrees with the Tax Court) and not to the entirely distinct question of the operational requirements introduced by the feeder organization amendments enacted in 1950, which is what this case is all about.

Whether the feeder organization amendments of 1950, including the rental proviso, in the circumstances presented here and as construed by the Tax Court granted "an exemption broader

than that which previously existed" as the majority says (*ante,* p. 706), depends, of course, on whether, in the court before which the issue was presented, the *Roche's Beach* view or the view of this Court in Ralph H. Eaton Foundation v. Commissioner of Internal Revenue, 219 F.2d 527 (9th Cir.) was followed. It thus borders on hyperbole to say that the views of the Foundation and the Tax Court "stand the feeder organization amendment on its head" (*ante,* p. 706).

The majority deems to be of no significance to the present case whether the amendments to the leasing proviso made in the Tax Reform Act of 1969, Title I, Sections 121(b) (2) (A) and 121(b) (7), 83 Stat. 487, 538–39, 542, adopting the "incidental" test as to rent from personal property argued for by the Commissioner in this case, and wisely avoided by the majority, reflected Congress's views of the effect of the 1950 amendments or constituted new law. Admittedly, the 1969 amendments foreclosed future arrangements of Cote type. I cannot agree that the 1969 amendments are of no significance in view of the fact that the Treasury Department, in order to persuade Congress to adopt the 1969 amendments, seemingly conceded that the Cote formula exempted income under the 1950 proviso and thus resulted in a "loophole" for income of feeder organizations which should be closed. In fact, the Department presented to Congress the very facts of the instant case, thinly disguised by the use of letters instead of names, in urging reform in the field of exemption of feeder organizations. Treasury Department Report on Private Foundations, Senate Committee on Finance, 89th Cong., 1st Sess., 31–32 (Comm. Print 1965).

I cannot escape the feeling that running through the majority opinion and, in a sense, dictating its result, is a so-cio-economic philosophy that there was something sinister about the Cote formula, since by ingenious, complex, and somewhat unorthodox arrangements, it managed, if successful, to cause income otherwise taxable to escape taxation by adhering, if the Tax Court and I are right, to the strict language of the taxing statute. Thus the majority refers disparagingly to "trading on its tax exemption" (*ante,* p. 708) and cites numerous commentators who do not like this sort of thing. The majority seems awed by the success of the Foundation, resulting in impressive profits paid or accumulated for payment to Loyola University, which is, of course, at least in part attributable to the business acumen of its management and is in any event legally irrelevant.

In my view, however, it is well to bear in mind in every tax case Judge Learned Hand's remark that:

"Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." Helvering v. Gregory, 69 F.2d 809, 810 (2nd Cir.).

Or as Lord Sumner, L. J., put it:

"They incur no legal penalties and strictly speaking, no moral censure if, having considered the lines drawn by the Legislature for the imposition of taxes, they make it their business to walk outside them." Levere v. Inland Rev. Commrs., [1928] A.C. 217, 227.

In my view the clear language of the Code can be circumvented only if the "incidental" or "passive" test is adopted and found to be violated in this case. The majority rejects the former and upholds the Tax Court with respect to the latter. I therefore fail to see how the holding of the majority can be justified.

I would accordingly affirm.